# CHARLESTOWN.

## RIDDLE *v.* McGINNIS.

Submitted June 15, 1883—Decided October 2, 1883.

1. In an action by a father, or by one *in loco parentis* for the seduction of a daughter it is no longer necessary to allege or prove, the loss of service of the female, or the value of such service section 1 of chapter 103 of Code of West Virginia having changed the common law rule in such cases.   (p. 271.)

2. In such an action it is still necessary to allege and prove that the relation of master and servant existed between the plaintiff and the female at the time of the commission of the wrongful act. (p. 272.)

3. In such a case where the daughter is under the age of twenty-one years, and was so at the time of the seduction, and the father then was, and still is entitled to her attentions and services—the law conclusively presumes that the relation of master and servant exists between them, although at the time of such seduction she may be in the *actual service* of another, under a contract made by herself securing to her the compensation for such service.   (p. 274.)

4. On the trial of an action brought by a father for the seduction of his daughter, evidence of the pecuniary condition of the defendant is admissible to show the *extent of the injury* caused to the plaintiff by the wrongful act of the defendant.   (p. 278.)

5. In an action by a father for the seduction of his daughter, a count in the declaration which avers, that "she is under the age of twenty-one years, and unmarried, and was so at the time of the seduction, and that the plaintiff then was, and still is entitled to her attentions and services"—sufficiently avers that the relation of master and servant exists between the father and daughter.   (p. 277.)

6. The statute, section 1, chapter 103 of Code of West Virginia, dispenses with the allegation and proof of loss of service of the female by reason of the wrongful act of the defendant, but does not alter the rule as to the commencement of the action by the father; and when the daughter at the time of the seduction, lived away from the father's house, and returned and was confined there and nursed—the statute of limitations will only begin to run from that time.   (p. 275.)

7. If the defendant in such a case would rely upon the statute of limitations of one year, he must plead it before or at the trial; and he cannot rely on it, and raise the question upon instructions to the jury.   (p. 275.)

| 22 | 253 |
| 34 | 243 |
| 22 | 253 |
| 37 | 784 |
| 22 | 253 |
| 40 | 260 |
| 22 | 253 |
| 42 | 816 |
| 22 | 253 |
| 43 | 76 |
| 22 | 253 |
| 44 | 362 |
| 22 | 253 |
| 47 | 125 |
| 22 | 253 |
| 50 | 319 |
| 22 | 253 |
| 52 | 171 |
| 22 | 253 |
| 56 | 189 |
| 57 | 475 |
| 22 | 253 |
| 58 | 81 |
| 58 | 551 |
| 22 | 253 |
| 62 | 549 |
| 63 | 417 |
| 22 | 253 |
| 64 | 223 |
| 22 | 253 |
| 66 | 672 |

8. In such an action the jury, in estimating the damages sustained by the plaintiff, may take into consideration the mental anguish, the dishonor and shame endured by the plaintiff, as well as the actual expenses incurred by him, by reason of the wrongful act of the defendant. (p. 281.)

9. The verdict of a jury in such a case in favor of the plaintiff will not be set aside on the ground that the damages are *excessive*, unless they are so *enormous*, as to furnish evidence of partiality, passion, corruption or prejudice on the part of the jury. (p. 280.)

10. A motion for a continuance is addressed to the sound discretion of the court; and although the applicant may by his own oath, show a *prima facie* case entitling him to a continuance on account of the absence of a material witness, yet if from the circumstances of the case, or from the statements of the applicant the court is satisfied that the real purpose of the motion is to evade, or delay the trial, and not to prepare for it, the motion ought to be overruled. (p. 268.)

11. In such a case, if a party moves to continue the cause on account of the absence of a material witness the court may, at the first calling of the cause for trial, require the party to state the facts he expects to prove by such witness—and if they be such, as could not affect the result of the trial, the motion for a continuance should be overruled. (p. 269.)

12. A case in which a verdict of a jury rendered in favor of the father for three thousand dollars damages, for the seduction of his infant daughter, while living out at service, with the defendant, was upheld by the court. (p. 282.)

The facts of the case are fully stated in the opinion of the Court.

*R. S. Blair* for plaintiff in error.

*P. W. Morris* for defendant in error.

WOODS, JUDGE:

This was an action on the case in the circuit court of Ritchie county, commenced on the 24th of April, 1882, by Eli Riddle against Benjamin McGinnis claiming five thousand dollars damages for the alleged seduction by him, of the plaintiff's daughter Rosa Alice Riddle. Process was returned executed, and declaration filed and conditional judgment entered therein at the May rules, and at the June rules, 1882, conditional judgment was confirmed and a writ of en-

quiry awarded to inquire of the plaintiff's damages.    At a circuit court held and continued for the said county on the 29th ·of June, 1882, the defendant appeared and demurred to the said declaration and to each count thereof.    The court sustained said demurrer to the *first,* but overruled it as to the *second count,* which declaration is in these words and figures :

"Eli Riddle complains of Benjamin McGinnis, who has been duly summoned, &c., of a plea of trespass on the case, for that the said Benjamin McGinnis heretofore, to-wit, on the 1st day of January, 1881, at the county aforesaid, seduced, and at divers other times between that day and the commencement of this suit, debauched and carnally knew Rosa Alice Riddle, who was then and still is under the age of twenty-one years and unmarried, and who at the time of such seduction was a virtuous and innocent daughter of the plaintiff, and the plaintiff then was and still is entitled to the comfort and benefit of her society, attention and services, and by reason of said wrongful act of defendant, he, plaintiff has sustained great loss and damages, to-wit, five thousand dollars, and therefore he sues, &c.

"Second count—And for that, whereas, the said Benjamin McGinnis, contriving and unjustly and wrongly intending to injure the said Eli Riddle and to deprive him of the service and assistance of Rosa Alice Riddle, the daughter and servant of him, the said Eli Riddle, to-wit, on the — day of January, 1881, at the county aforesaid, and on divers other days and times between that day and the day of commencing this suit, debauched and carnally knew said Rosa Alice Riddle, then and there, and from thence for a long space of time, to-wit, up to the commencement of this suit, being the daughter and servant of him, the said Eli Riddle, whereby said Rosa Alice Riddle became pregnant and sick with child, and so remained and continued for a long space of time, to-wit, for the space of nine months then next following, at the expiration whereof, to-wit, on the 9th day of April, 1882, she, the said Rosa Alice Riddle, was delivered of the child with which she was so pregnant as aforesaid, to-wit, at the county aforesaid.    By means of which said several premises, she, the said Rosa Alice Riddle, for a long space of time, to-wit, from the day and year first above mentioned hitherto, became and was

unable to do or perform the necessary affairs and business of Eli Riddle, so being her father and master as aforesaid, and thereby he, said Eli Riddle, during all that time lost and was deprived of the service of his said daughter and servant, to-wit, at the county aforesaid; and also by means of the said several premises, he, the said Eli Riddle, was forced and obliged to and did necessarily pay, lay out and expend divers sums of money, amounting in the whole to a large sum of money, to-wit, the sum of fifty dollars, in and about the nursing and taking care of said Rosa Alice Riddle, his said daughter and servant, and in and about the delivery of the said child, at the county aforesaid, to the damage of the said Eli Riddle five thousand dollars. And therefore he brings his suit, &c."

The defendant then pleaded not guilty, and issue was thereon joined, but no other plea was tendered or filed. The defendant on the 29th of June, 1882, when the case was called for trial, moved the court to continue the cause for the reasons stated in his first bill of exceptions, which motion the court overruled, and the defendant excepted and filed his first bill of exceptions in the following words:

"Be it remembered that upon the calling of this cause the defendant in person and by his attorney Thomas E. Davis appeared in open court and moved the court for a continuance of this cause, and assigns the following grounds for such continuance:

"First. This suit was instituted against the defendant on the 24th day of April, 1882, and the process served upon him the following day, to-wit, the 25th day of April, 1882, and returnable to May rules, 1882, and that from the time of the service of the process and the return thereof, the defendant had not sufficient time to prepare himself for the trial of this cause; that within a few days after the services of said process, he engaged the services of one Thomas E. Davis, attorney practicing in this court, to defend him, and paid him a retainer's fee therefor, and relied upon him to defend him in this suit.

"Secondly. That it was further shown to the court by the defendant on his oath, who had been introduced for the purpose of showing cause for a continuance, that Ellen Robinson

was a material witness in his behalf, and that he was informed and believed that she would testify to the following facts, which were required by the court to be reduced to writing by the defendant, and without said evidence he could not safely go to trial:

"Benjamin McGinnis, being duly sworn to answer such questions as may be asked him by the court or bar, deposed and said in open court on June 29, 1882:

" I can show by Ellen Robinson that she resided at my house at the time the child born to Rosa Alice Riddle should have been conceived, to-wit, nine months before Alice Riddle was delivered of child on the — day of ——, 1882; that at that time the said Alice was at a number of times in company with a man who paid her a great deal of respect, and that from their acts and ways she was led to believe that they were guilty of cohabiting together, and she did believe they cohabited, and that the man came to the house where said Rosa Alice Riddle was, brought whiskey with him, and he gave her drinks, and they went off from the house out of her sight after drinking, and that said Alice told her they were promised to be married; and that he kept a decent, orderly and respectable house, and never acted, said or done anything improper whilst she lived at his house—during all the time she lived there, to-wit, about one year.

"Attest:

"WILL A. STRICKLER,

" *Clerk Circuit Court, Ritchie County, West Virginia.*"

The defendant further stated under oath that he could not prove said facts by any person else other than Ellen Robinson, and that he did not know of his own knowledge that she would swear to such facts, but he was informed that she would, and upon such information he believes she would. Whereupon the court stated that if she was to swear to the same, he would be compelled to exclude the same from the jury, as it was not pertinent to the issue in this cause.

And the defendant further stated that he had used due diligence to ascertain the whereabouts of the said Ellen Robinson, both by inquiry and writing, and had ascertained that she was in Kansas, but not in time to take her testimony in this cause; and that he was informed by his counsel and upon

which he relied, that by the ruling of the court in former matters of continuance, that they could not compel him to go to trial under the circumstances, and therefore he did not cause any subpœnas to issue for his home witnesses, and in support of which, the affidavit of Thomas E. Davis, his attorney, was then filed.

### AFFIDAVIT OF THOMAS E. DAVIS.

"ELI RIDDLE
    *vs.*               } Trespass on the case.
BENJAMIN McGINNIS.

"Before the undersigned authority' personally appeared Thomas E. Davis, and made oath in due form of law that he is counsel for the defendant in this cause; that he advised the defendant that the testimony of Ellen Robinson was material to him on trial of this cause, and that he could not safely go to trial without her. And he further declares that McGinnis gave him the names of other witnesses to have summoned in this cause, and that he having ascertained that said Robinson's testimony could not be obtained at this term of the court, he did not have the other witnesses summoned; and he informed the defendant that the court would grant him a continuance of this cause, judging from the ruling of the court heretofore because it was the first time of the calling of said cause, and that by him putting himself within the rule, the court would surely grant him a continuance for this term at least.

"He further declares that he offered to be qualified before the court to such advice given McGinnis; and further, that George Loomis was counsel retained in said cause to assist him, and that he did not feel like undertaking said cause in the absence of said retained counsel.

                                        "THOMAS E. DAVIS.

"Taken, sworn to and subscribed before me.
                        "R. S. BLAIR, *Notary Public.*"

"Which motion for a continuance being argued by counsel for the plaintiff and defendant, and considered by the court, was overruled, and the defendant compelled to go to trial. To which opinion of the court in overruling said motion for

a continuance of said cause, and requiring him to disclose to the court what he expected to prove by Miss Ellen Robinson, the defendant by his counsel, excepted, and prays that this his bill of exceptions may be signed, sealed and saved to him; and that the same is ordered to be made a part of the record in this cause, and which is accordingly done.

"THOS. I. STEALEY.    [SEAL.]"

On the 30th day of June, 1882, the cause was tried upon the issue on the plea of "not guilty," and the jury found a verdict in favor of the plaintiff for three thousand dollars damages for which judgment was entered on the verdict. To this judgment the defendant has obtained a writ of error and *supersedeas* from this Court. On the trial the defendant objected to the introduction of the testimony of Aaron Frey and Wm. M. Rymer, two of the plaintiff's witnesses, but the court overruled his objections and permitted their testimony to be given to the jury. To this ruling of the court the defendant again excepted, and filed his bill of exceptions No. 3, viz: "Be it remembered that on the trial of this cause the plaintiff in order to sustain the issue on his part introduced Aaron Frey, who testified that he knew McGinnis, the defendant; that he lived two or two and one-half miles from McGinnis and had so lived for nine years last past; what he is worth I cannot tell to save my life, but I think he is worth about eight thousand dollars. I'll give him my (Frey's) bonds for eight thousand dollars. And to further show the worth of the defendant, the plaintiff introduced one Wm. M. Rymer, who testified that the defendant was worth twenty or twenty-five thousand dollars; he would place it at that, and he would be willing to give fifteen thousand for it if he was able to pay it; that his wealth consisted of land and stock. I know that he owns seven hundred or one thousand acres of land; at least three years ago he owned it; don't know that he owns it now; don't know of my own knowledge that he owns either stock or land now, but he lived on the land day before yesterday, and he did not know that defendant had conveyed it away.

"To the offering of which evidence to the jury, the defendant, by his counsel, insisted that the same was not admissible, and moved the court to exclude the same from going to

the jury, but the court decided that the evidence so offered by the plaintiff should go to the jury for what it was worth, and the same was accordingly admitted to the jury and left to their consideration. To the ruling of said court in admitting such testimony and in permitting the same to go to the jury for their consideration, the defendant, by his counsel, excepted, and prays that this his bill of exceptions may be signed, sealed and saved to him, and which is ordered to be made a part of the record in this cause, which is accordingly done.          "THOS. I. STEALEY. [SEAL.]"

Before the jury retired the defendant moved the court to give them the series of instructions set forth in his second bill of exceptions, which the court refused, but in lieu thereof, gave the jury certain instructions, which also appear in said second bill of exceptions, to which ruling of the court refusing to give the instructions, as asked for, and in giving said instruction in lieu thereof, the defendant again excepted, and filed his "bill of exceptions No. 2" in these words:

"Be it remembered that upon the trial of this cause the defendant on cross-examination of the plaintiff's witnesses, Rosa Alice Riddle and the plaintiff, as shown by the evidence certified, elicited evidence tending to show that the relation of master and servant between plaintiff and daughter did not exist at the time of the charge of seduction set up in the declaration in this cause. And it was further shown by the evidence in this cause on the part of the plaintiff, that the first act of criminal intercourse was committed in February or March, 1881.

"The defendant, by his counsel, after the case was submitted to the jury and before they retired to consider of their verdict, moved the court to instruct the jury as follows:

" '1. If the jury believe from the evidence that there did not exist the relation of master and servant at the time of the alleged debauching of Rosa Alice Riddle by the defendant between the plaintiff and the said Rosa Alice Riddle, then they must find for the defendant. And the jury is further instructed that under the count in this declaration the plaintiff can only recover for loss of service proven and not consequential damages, and if no service be shown, they must find for the defendant.

" '2. The jury are instructed that in this action the plaintiff's right to recover rests upon the loss of service, not on the seduction of Rosa Alice, and there must be evidence to satisfy your mind of such loss of service before you can find for the plaintiff, and if you are satisfied no service was proven, then you must find for defendant.

" '3. The jury are instructed if they believe that more than a year elapsed between the time of the commission of offence, to-wit, seduction, and the time of bringing this action, the plaintiff is not entitled to recover.

" '4. The jury are instructed that if they believe from the evidence in this cause that plaintiff's daughter and servant *per quod servitium amisit*, is not maintained by evidence, that the daughter, though under age, living in another person's family in the capacity of a hired girl or housekeeper, and if they believe from the evidence that at the time she went into the service of another with no intention of returning, the relation of master and servant as between the plaintiff and his daughter did not exist; and if they further believe from the evidence in this cause that during her stay with the defendant that the plaintiff never exercised any legal control over her acts or received any compensation for her work from the defendant, then they must find for the defendant.

" '5. The jury are further instructed that if they believe from the evidence in this cause that the plaintiff charged his daughter, Rosa Alice Riddle, her board during the time of her sickness after her seduction and return home, it is a circumstance the jury may take into consideration as to the abandonment or renunciation of his relation to his daughter and servant; therefore they must find for the defendant.

" '6. The jury are further instructed that if they believe from the evidence that the daughter of the plaintiff was at the time of the seduction in the service of another with no intention of resuming the relation, that of master and servant did not exist, then under the count in the declaration, to-wit, second count, the plaintiff cannot recover.'

"But the court refused to give said instructions to the jury, but gave the following instructions in lieu thereof:

" 'The jury are instructed that this action is based upon the right of the plaintiff to recover damages for the loss of ser-

vices of the daughter occasioned by the wrongful act of the defendant, and in order to maintain this action, the plaintiff must show to your satisfaction by the evidence in this cause that some loss of service was sustained by the plaintiff, however small or slight; that if you are satisfied from the evidence in this cause the plaintiff did sustain loss of services of his daughter, and that such loss of services was occasioned by the seduction and wrongful act of the defendant, then you may take into consideration the shame, loss of respect and mortified feeling of the plaintiff, and give such exemplary damages as you may believe the plaintiff entitled to. The jury are further instructed that if they believe from the evidence in this case that the daughter of the plaintiff was seduced by defendant whilst at the defendant's house and in his employ, and that she was under the age of twenty-one years, then unless the evidence in this cause should satisfy you that the plaintiff had relinquished all control over the daughter and all right to her services, the law presumes that the plaintiff is entitled to her services, and any loss of services sustained by the plaintiff occasioned by such act of seduction, does entitle the plaintiff to recover.'

"To the opinion of the court in refusing the said instructions asked for, and to the giving of the instructions by the court in lieu thereof, the defendant, by his counsel, excepted and tendered his bill of exceptions, and which he prays may be signed, sealed and saved to him, and which is ordered to be made a part of the record in this cause, which is accordingly done.                    "THOMAS I. STEALEY. [SEAL.]"

After the jury had rendered their verdict and were discharged the defendant moved the court to arrest the judgment upon the verdict, and to set the same aside and award him a new trial because the verdict was contrary to the law and the evidence, and because the damages were excessive, which motion the court overruled, and the defendant again excepted and filed his fourth bill of exceptions in which the court certified the facts proved *on the part of the plaintiff, no evidence* having been introduced by *the defendant.* The facts and evidence so certified, are in substance as follows: That the plaintiff and defendant were well acquainted with each other for thirty odd years; that they

are close neighbors, their farms being in sight of each other;
that plaintiff believed defendant to be a gentleman; that
plaintiff's daughter, who was born December 28, 1861, when
about sevenfeen years of age, at the request of defendant,
with the consent of plaintiff, went to live at defendant's
house to work for him, and to help his mother, aged about
seventy-six years, the defendant being unmarried; that she
continued to live with and work in defendant's family, sleep-
ing in the same room with his mother, until the last Monday
in January, 1882; that defendant about March 1, 1881, about
midnight in her own bed, debauched and carnally knew
plaintiff's daughter at defendant's house while living there;
that this criminal intercourse continued for a long time;
that she became pregnant by him at his house; that she first
became aware of her condition in August, 1881; that the
defendant was the father of her child of which on the 9th of
April, 1882, she was delivered at her father's house; that she
never had sexual intercourse with any other man; that she
never told any one of her offence; that said daughter *will be
twenty-one years old on December* 28, 1882; that after plaintiff
found out the condition of his daughter, he talked with de-
fendant about it, who admitted himself to be guilty of the
act of begetting the child, saying "that he did not violate
any bastardy law as there had been none for two years, and
that if plaintiff sued him he could not get a jury of twelve
men without some of them being in his condition; that bas-
tardy suits were so common that plaintiff would not get any-
thing; that he (defendant) had kept her (the daughter) as
long as he could, that it was in everybody's mouth; he could
get nobody to stay there, and could not take care of her, '*and
that if plaintiff did not want her, he* (plaintiff) *could turn her out,
she was such a walker she could find some place to lay*;' that if
plaintiff did not wish to turn her out, she could pay her
board, she had plenty of money, that she had twenty dollars
to pay her board with, one ten and two five dollar bills!"
and that he did not " know why plaintiff came to *him in the
cold,* when plaintiff could *hear all about it from 'Alice' at home.*"
It was further proved that plaintiff took his daughter home,
and provided for her, in his family, consisting of two other
daughters and one son at home, and another son not at

home and himself; that when his daughter was confined plaintiff was put to trouble, had Drs. Talbott and Rymer; was up night after night, made no calculation of costs, *she was his child,* and if it had cost him his *last piece of bread,* he would have done it; he would not have done it for five thousand dollars; that it probably cost defendant one hundred dollars to meet actual damages for these few months; that plaintiff would not bear actual expenses for one hundred dollars; that plaintiff *was deprived of her services* when she was sick; that he was *entitled to them*; that she could not perform labor; was incapacitated from labor by the condition and state of her health, six weeks after her child was born, she was unable to perform labor from the last day of January, 1882, up to six weeks after the birth of her child; that defendant told plaintiff, "*that if fathers wanted their children taken care of and protected they could do it themselves;*" that the first of the said conversations with defendant took place before any proposition for compromise was made *except what was in writing*; the last was afterwards; that plaintiff had no conversation with defendant before the offer of compromise in writing was sent and rejected; that plaintiff went to defendant, to see what he would do; plaintiff wished to keep out of a law suit, wrote to him, got no answer, then went to see him and proposed to "*referee*" the matter. On April 11, 1882, plaintiff made to defendant a proposition for a compromise; that the daughter Rosa Alice Riddle brought home twenty dollars which she said she got from defendant, and she stayed at defendant's house after the commission of the first offence *for over a year*; that she made arrangements to go home two weeks before her child was born; that she received her own wages while living with defendant, and had worked for herself and received the wages since she was sixteen years old; that her father received only what she gave him; that the daughter's home was at plaintiff's house; that plaintiff always recognized Rosa Alice Riddle as his daughter, and under his care and directions when not employed by defendant; that she was under the control of plaintiff, who let her go out and work for herself and have her own wages, she had the liberty to come home whenever she wanted to, but was not at home

more than two weeks at a time; that on the last Monday in January, 1882, plaintiff was at defendant's house, when he first saw her condition; that she came home that day and remained until the next morning; that plaintiff then said nothing to her about her condition; that plaintiff was "*so astonished with grief, anger and mortification that he almost lost his identity;*" that on the night of the last Monday in January, 1882, he concluded he must send her back to defendant, with *an instrument of writing*, which he did, but she came back in two weeks, in the same condition; that the child was born at plaintiff's house on Easter Sunday, April 9, 1882; that she said she had some other money, and at her lying-in, she paid Dr. Talbott ten dollars and seventy-five cents, for medicine seventy-five cents, and to a girl for taking care of her one dollar and fifty cents; plaintiff boarded her and charged her for board one dollar and fifty cents per week, but did not charge her for *fire.* It was further proved that defendant is a single man and was never married, and in a conversation with the witness the defendant "wanted to know of witness if he had seen Alice and the baby, and if the baby looked like him; that witness told him it did, and defendant replied, *very likely it did*, but he could prove his character up to that time." It was further proved by one witness that defendant was worth not less than eight thousand dollars, and by another that he is worth about twenty thousand dollars—that he owns from seven hundred to one thousand acres of land for which witness would be willing to give fifteen thousand dollars. As the defendant offered no evidence, and did not by his own testimony offer to contradict any of the evidence offered by the plaintiff, the jury were fully justified in believing the same, and this Court under the circumstances will regard the testimony and facts *certified*, as *facts proved on the trial.*

The plaintiff in error has assigned the following errors:

First.—In overruling his motion for a continuance for the reasons set forth in his first bill of exceptions.

Second.—In compelling him to *reduce to writing* what he expected to prove by the absent witness, Ellen Robinson, because there were no circumstances brought to the notice of the court, or *discovered* by the *court itself*, to *satisfy* the court,

that the real purpose of the defendant in moving for a continuance was to delay or evade a trial, and not to prepare for it.

Third.—In refusing to give the instructions asked for, and in giving the ones he did give.

Fourth.—In refusing to exclude from the jury the testimony given by the witnesses Rymer and Frey, set forth in his third bill of exceptions; and

Fifth.—In overruling his motion to arrest the judgment, set aside the verdict because the damages were excessive, and in refusing to award him a new trial.

Did the court err in overruling the motion of the defendant to continue the cause?

To show himself entitled to a continuance the defendant put himself upon the witness stand, and being sworn to answer such questions as might be asked him by the court or bar, he made the statement set forth in his first bill of exceptions, *which statement* was required by the court to be *reduced to writing.* It was absolutely necessary that this should be done, in order that the defendant might have the benefit of the ruling of the court thereon, and the court did not err in doing so. But if the witness, Ellen Robinson, had been present in court, and on the trial of this action, had deposed to all the facts set forth in said bill of exceptions, her testimony would have been wholly immaterial as well as inadmissible. All these statements might be true, and Rosa Alice Riddle be as pure and spotless as the snow—or, she may then have been debauched and ruined by the defendant; that she was seen "in the company of a man who *paid her a great deal of respect,*" or that she had gone off from the house with him, *out of the sight of Ellen Robinson,* who may have *believed* that he and she were guilty of cohabiting together, affords no just grounds to believe her criminal. All these things might occur, and they often do occur, and the parties be perfectly innocent. It will scarcely be contended that the *belief* of a *suspicious witness* can be accepted as *proof* of a crime, which the witness does not even *pretend to say,* has ever been committed. But whether such testimony be true or false, it does not tend to show that Rosa Alice Riddle had not already been, or that she was not afterwards debauched by the de-

fendant. Neither was the defendant's motion aided by the mistaken advice given him by his counsel on which he relied, that the court would not try the cause at the first term it came upon the court docket. It is not to be supposed that his counsel did not know that the plaintiff was entitled to have his cause tried at that term, *unless* the defendant showed good cause for a continuance. Code W. Va. chapter 131, section 6, and Acts 1882, chapter 120, section 6. This bill of exceptions does not show that the defendant made any preparation for his defence, except to ascertain that the absent witness could not be present, or her deposition taken, or that he had any other witnesses, for although it appears he lived only six miles from the court house, no witnesses were summoned, nor did the defendant when he found the cause must be tried, ask for time to summon or send for them; which would doubtless have been allowed him, if he had asked for it. If it be insisted by the defendant that the court was *bound to believe all the defendant stated in his examination as set forth in his first bill of exceptions*, then it was exceedingly unfortunate, that amongst all his neighbors, no one but Ellen Robinson could be found who was able to prove, that during the year she lived at the defendant's house, "*he kept a decent, orderly and respectable house.*" If she had been present at the trial and had testified that the "defendant had kept a decent, orderly and respectable house, and never acted, said or done anything improper during all the time she lived there, which was about a year;" yet such a statement must have been received with the qualification necessarily implied—"*so far as I know.*" With or without this qualification such a statement would have been wholly immaterial, for there is nothing alleged against the defendant, which implies that he did not "keep a decent, orderly and respectable house" while she lived there, or at any other time.

But it is insisted that the court had no right to require the defendant to state the facts he expected to prove by the absent witness, because the case had never before been continued, and because no facts appeared, or were discovered by the court to induce the belief that the motion was only made to delay or evade a trial. To this argument we might reply, that there is nothing in the bill of exceptions to show that

the court did so, but it shows, that the defendant offered himself and being sworn in the usual manner to "make true answers to such questions as may be asked by the court and bar," he made the statement referred to, which the court very properly required "*should be reduced to writing.*" But if it be admitted that the court on the first calling of the cause for trial, did in fact require the defendant, on his motion for a continuance to state the facts which he expected to prove by the absent witness he was fully warranted by the authority of the adjudicated cases in so doing. The act of the Legislature passed on the 25th of March, 1882, which went into effect on the 25th of June, 1882, expressly provides that "it a continuance be asked, because of the absence of a witness, an affidavit must be filed, if required by any party opposing, setting forth in addition to other matters, in order to obtain a continuance, the name of the witness and the testimony he is expected to give, and if required by the opposing party submit to cross-examination in open court upon the matters set forth in such affidavit. See Acts 1882, chapter 120, section 6. If then it be true that the court did require such facts to be stated, this Court in the absence from the record of anything to show the contrary, will presume that such facts *were made to appear* in the court below as made it *proper* to *require such facts to be stated.* The counsel for the plaintiff in error has referred the Court to the cases of *Hewitt* v. *Commonwealth,* 17 Gratt. 627; *Harman* v. *Howe,* 27 Gratt. 629, and *Betsall* v. *State,* 11 W. Va. 726, in support of his position. A careful examination of these authorities and of the cases cited therein is fatal to his pretensions. They all concur in establishing the following propositions: "That a motion for a continuance is addressed to the sound discretion of the court, under all the circumstances of the case; and though the appellate court will supervise the action of the inferior court on such a motion, it will not reverse a judgment on that ground, unless such action was plainly erroneous." And that, "where the circumstances satisfy the court that the real purpose in moving for a continuance is to delay or evade a trial, and not to prepare for it, then, though the witnesses had been summoned, and the party has sworn to their materiality, and that he cannot safely go to trial without them,

the continuance should be refused." And in the case of *Harman* v. *Howe*, *supra*, it was expressly held that as a conse-quence of this doctrine the court may, when it has reason to believe the object of the motion to continue is to evade or delay a trial, require the party applying for such continuance to state what he expects to prove by such absentee, and if the facts which he states he expects to prove, will not affect the result of the trial, the motion should be overruled. We are therefore of opinion that the court below did not err in overruling defendant's motion for a continuance or in requiring him under the circumstances disclosed in the record, to state what facts he expected to prove by the said Ellen Robinson.

Did the court err in refusing to give to the jury the series of instructions asked for as set forth in the second bill of exceptions, or in giving the instruction mentioned therein?

It will be observed from said second bill of exceptions that the six several instructions asked for, were offered with the intention of covering all the questions of law arising out of the pleadings, and also to supply the place of a plea of the statute of limitations, which was neither offered nor filed. They were offered as a *whole*, or as an instruction containing *six legal* propositions, and the court was asked to give them *all to the jury*. It is a well settled rule of law that if a general demurrer be entered to a declaration containing several counts, and any of them be good, the court will overrule the demurrer. The same rule holds good where several instructions are asked to be given as a whole to the jury, or where one instruction containing several legal propositions is offered, for if any one of the series of instructions offered as a whole, or any one of the legal propositions contained in the single instruction asked for, be erroneous the court will refuse to give such instructions and in refusing to give them, the court is not bound to modify or correct them, nor to instruct the jury generally on the whole law of the case, although it is not error in the court to do so.

Before passing on the correctness of the instructions refused, and on those given by the court, let us briefly review the peculiar character of this action.

It has been the boast of the common law lawyers, that the

common law is the perfection of human reason, and is capable of being moulded and transformed, so as to adapt itself to all the necessities of an ever changing, and advancing civilization, and that there can be no wrong for which it cannot furnish a remedy. Yet with all its boasted excellence it wholly failed to provide any form of action where a parent as such, or one standing in *"loco parentis,"* could recover pecuniary compensation for the humiliation, shame, dishonor and anguish endured by him, or brought upon his family or household, by the libertine who with stealthy step invaded the sacred precincts of domestic peace, and seduced a daughter from the path of purity and virtue, and left to her and her child only a heritage of shame. For the wrong and injury done to the offending daughter, the law provides no remedy. For an injury done to a servant, which rendered him less able to render the service due to the master, he had his action on the case *"per quod servitium amisit."* By the common law the father had the absolute legal right not only to the custody and care of his infant children, but also to their society and labor, and he was in many instances liable for their education and maintenance. His legal right to their society, attentions and services, during their minority possessed a pecuniary value to him, and to this extent they became his servants, and he their master, and as a consequence of this relation of master and servant, his right of action against any person who by wrong or injury done to his servant rendered him less able to perform his usual service, has always been maintained. Here then we find the legal foundation of the father's action on the case, for the seduction of his daughter. The father is the master; the daughter is the servant; her seduction and consequent pregnancy render her less able to give him her usual attentions, or perform for him her usual services; to these he has the clear legal right; these attentions and services to him, have a pecuniary value; of these he has in a measure, been deprived by the wrongful act of the seducer; and to this extent, he has suffered not only a *pecuniary loss,* but mental anguish, for which pecuniary damages afford him no adequate compensation. His right to recover damages for the actual value of these services of which he has thus been deprived is perfect, and resting on

this foundation, the common law affords him his action of trespass or trespass on the case "*per quod servitium amisit,*" for the seduction of his daughter. From this cursory view of the subject it is clear that this action is founded on the relation of "master and servant," and not on that of "parent and child."

Therefore to enable the father to maintain this action for the seduction of his daughter, the relation of master and servant must exist between them at the time of the seduction, though this relation need not in any case, be created by contract; it must be alleged and shown that this relation so existed, that the daughter, rendered the father some service, no matter how *trivial* or valueless, and that he has been to some extent deprived of these services by her seduction. These facts alleged and proved, the father by the common law, was entitled to recover from the seducer of his daughter, damages for the loss occasioned by his wrongful act, and the father's right to sue for and recover the same, accrued as soon as the *loss consequent upon the wrongful act,* was sustained, and not before, for the *loss sustained by the master was the real foundation of the recovery,* and not the wrongful act which occasioned the loss. *Lee* v. *Hodges,* 13 Gratt. 726, and cases therein cited; *Clem* v. *Holmes,* 33 Gratt.; *White* v. *Nellis,* 31 N. Y. 405; 5 Wait's Actions and Defences 656 and cases there cited.

While at common law, the father and master, was obliged to allege and prove the *loss of service,* however trivial or valueless, as the foundation of the recovery, yet it was regarded only as the *foundation,* for the courts have always treated, the relation of master and servant, and the *loss* of service, as innocent fictions which merely served to give the court jurisdiction, while the measure of the plaintiff's damages was not merely the *actual value* of the *services lost,* but compensation for the shame, disgrace and anguish, suffered by the father, in the defilement and ruin of his daughter. These elements now enter into, and generally constitute the real measure of damages, while the jury, in estimating them must almost necessarily be influenced and controlled by the position of the parties in society, and by all the other circumstances surrounding each particular case. But the rule at

common law, which required the father to allege and prove the loss of service occasioned by the wrongful act of the seducer, no longer exists in this State, for by section 1 of chapter 103 of the Code, it is expressly declared that "an action for seduction may be maintained, without any allegation or proof of the loss of the service of the female by reason of the defendant's wrongful act."

All that is now necessary to be alleged and proved is, that the relation of master and servant existed between the father and daughter at the time the fact occurred, which, as the law formerly was, would have occasioned the loss of service of the daughter.

This relation of master and servant between father and daughter, where she lives in her father's family, even when she is over the age of twenty-one years, and when he has no legal right to command her services or to receive her wages, is established by proof of the most trivial or valueless services rendered by her in his family, such as making tea, mending stockings, milking his cows, presiding at his tea-table, or any other acts of service however slight. *Bennett* v. *Alcott*, 2 Term Reports 166; 2 Greenl. Ev. §§ 573 and 576; 9 Johns. 387; 11 Wend. 461. And in *Fores* v. *Wilson*, Peakes' N. P. cases 55, which was an action for assaulting and debauching plaintiff's maid, Lord Kenyon held, "that while there must subsist some relation of master and servant, yet a very slight relation was sufficient, as it had been determined that when daughters of the highest and most opulent families have been seduced, the parent may maintain an action on the *supposed* relation of master and servant, though every one must know that such a child cannot be treated as a menial servant." And Spencer, judge, in delivering the opinion of the court in *Martin* v. *Payne*, 9 Johns. 390, says: "Put the case of a gentleman's daughter at a boarding-school debauched and gotten with child, on what principle can the father maintain the action, but on the *supposed* relation of master and servant arising from the power possessed by the father to require menial services; for in such a case there is no actual existing service, constituting the relation of master and servant. Would it not be monstrous to contend that for such an injury the law afforded no

redress?" In *Martin* v. *Payne*, the daughter was nineteen years of age, and by her father's consent lived with her uncle and received a shilling a day, worked for herself, and expended all her earnings in clothes and necessaries for herself as she saw fit. While working for her uncle, she occasionally visited her father's house, remaining there for a week at a time. The father had done no act dispensing with his daughter's services, except to consent that she might work for her uncle. While there she was debauched, after which she returned to the house of her father, who supported her, and where she was confined; and the supreme court of New York held that the daughter was the father's servant *de jure*, though not *de facto*, at the time of the injury, and being his servant *de jure* he could maintain his action for seduction. 9 Johns. 390, *supra*.

But in cases where the unmarried daughter is a minor, and lives with her father, or by his consent, lives with and works for another, and receives and expends her own wages, he is always at liberty to recall his consent, and to command her services, and to resume his relation of master *de facto*, as he previously was *de jure*, for he is by law entitled to the comfort and benefit of her society, attentions and services, unless he has in some lawful and binding manner renounced all claims to her services. This absolute relinquishment by the father of all control over the person and conduct of an unmarried daughter under the age of twenty-one years, is never to be presumed but ought to be established by the clearest proof or by circumstances so cogent as to be equivalent thereto. *Clark* v. *Fitch*, 11 Wend. 459.

The case of *Lee* v. *Hodges*, reported in 13 Gratt. 726, was an action brought by the father for the seduction of his daughter, who was debauched while living away from her father's house, on a contract for service made by herself. Daniel, judge, delivering the opinion of the court, reviewing the cases above cited, says: "That in this country the rule is established, that whilst the daughter is under twenty-one years of age she will for the purposes of the action, be regarded as the servant of the father, though not living with him, but away from him in the family and service of another, except where the father has renounced or abandoned her

totally and divested himself of all right to reclaim her services."

The case of *Clem* v. *Holmes* reported in 33 Gratt. 722, was an action on the case brought by the father for the seduction of his minor daughter, who was debauched by the defendant at his house while she was there in temporary service. She returned to her father's house, where she was delivered of a child, and expense and loss were incurred by the father in nursing and taking care of her during that period. The declaration contained two counts; the first was in the usual common law form, and the second was in the precise words of the first count, of the plaintiff's declaration in this case, excepting only the names of the parties, and is an exact copy of the form, contained in the 4th vol. of Rob. New Pr. page 626. The defendant demurred to the whole, and to each count in the declaration, which the court overruled. The defendant then pleaded not guilty, and the statute of limitation of one year; plaintiff took issue on the pleas and there were a verdict and judgment for the plaintiff. It will be observed that in said second count in that and the first count in the declaration of the case at bar, the plaintiff does not in distinct terms allege that the daughter was the plaintiff's servant, or that he lost or was deprived of the service of his daughter and servant. The last allegation, always essential in common law declaration for seduction, is in explicit terms dispensed with in the Code of Va. of 1873 chapter 145 section 1, and also by section 1 chapter 103 Code of W. Va. But while the necessity of alleging or proving the loss of service of the daughter is dispensed with, no other change was thereby made in the common law governing this action; it is therefore still necessary that the declaration shall allege, that the relation of master and servant existed at the time, when (as they stood before the change) the loss occurred. But we have shown, that where the daughter is a minor and unmarried, and was so at the time of the seduction, and the father then was, and still is entitled to her services and attentions, *it is a conclusive presumption of law that the relation of master and servant exists* between them. As said section 1 chapter 103 of the Code of W. Va. makes no other change in the common law on this subject, and as the father's right of

action for this wrong did not accrue until he lost, or was deprived of the services and attentions of his daughter it follows, that if the defendant in the case at bar, had in the circuit court pleaded the statute of limitations of one year, as was done in the case of *Clem* v. *Holmes*, the plaintiff's right of action in the case at bar would not have been barred, because the plaintiff's daughter gave birth to her child on the 9th of April, 1882, and this action was instituted on the 24th day of the same month, and it was wholly immaterial, when the defendant first debauched and carnally knew the plaintiff's daughter; and so the court of appeals of Virginia in the case of *Clem* v. *Holmes*, 33 Gratt. 722, held, " That, in an action for seduction, the section of the Code which dispenses with any allegation or proof of the loss of service of the female by reason of the defendant's wrongful act, does not alter the rule as to the commencement of an action on the case by the father; and when the daughter lived away from her father's house at the time of the seduction, but returned and was confined there and nursed, *the statute of limitations will only begin to run from that time.*"    See also *Lee* v. *Hodges*, 13 Gratt. 726.   And in *Clem* v. *Holmes* it was decided that, " In an action by a father for the seduction of his daughter a count which avers she is twenty-one years of age, and unmarried, and was so at the time of the seduction, and the plaintiff then was, and still is entitled to her attentions and services, sufficiently avers the relation of master and servant, between the father and daughter."   We concur in the correctness of these conclusions, and hence the circuit court did not err in refusing to give to the jury the third instruction specified in defendant's second bill of exceptions, first, because it is uncertain, whether it intended to declare that the statute of limitation commenced to run from the time of the commission of the first criminal intercourse where the plaintiff's daughter was debauched by the defendant, or from the time when from her pregnancy and confinement the plaintiff was deprived of her society, attentions and services; and secondly, because the defendant had not pleaded the statute of limitations which he must do before he can have the benefit of the bar created by that statute.   The defendant's first instruction was *clearly erroneous* because it declared that the plaintiff

could only recover for loss of services proved, and not conse-
quential damages, and if no services be shown the jury must
find for the defendant, because as we have already shown,
that even at common law, when it was necessary to allege
and prove the loss of service, the jury in assessing the
damages was not confined to the value of the services lost,
but might consider the shame, disgrace and humiliation suf-
fered by the plaintiff; and also because the Code expressly
dispensed with the necessity of alleging or proving any loss.
of service whatever.   The second instruction is in substance
the same as the first and was equally erroneous for the same
cause.   The fourth instruction cannot be sustained for it does
not follow from anything therein stated, that the daughter
was not a minor, living with the defendant by the father's
consent, at the time she was debauched, or that the father
had not, at that time or when she returned to his house the
right to recall his consent that she might live with and work
for the defendant, or that he had not at all times the legal
right to require her society, attentions and services, for if he
still possessed said right, it was wholly immaterial whether
he exercised any legal control over her acts or whether he
received any compensation for her services or not, it was
*sufficient if he had the right* to do so.   If the plaintiff's daugh-
ter was a minor, and unmarried at the time of her seduction,
and he then and at the time of her confinement was entitled
to her society, attentions and services, she was his servant,
notwithstanding the fact, that during her sickness, he charged
her for her board, and this fact under these circumstances
affords no evidence whatever tending to show he had aban-
doned or renounced the relation of master and servant be-
tween him and his daughter.   For the reasons just stated,
the defendant's fifth instruction was erroneous and was right-
ly refused.   His sixth instruction is equally erroneous for it
is immaterial whether the daughter when she went out to
service intended to return or not.   If she did in fact return
to her father's house, after she was debauched, and resume
the relation of servant to her father, although she may have
been of full age, and was confined and nursed there, by him,
he has the right to maintain his action for her seduction and
much more therefore, if she was an infant, unmarried and

legally subject to his control and authority; we are therefore of opinion that the circuit court did not err in refusing to give said *series* of instructions or any of them to the jury. And we are further of opinion that the said court did err in sustaining the defendant's demurrer to the first count of the plaintiff's declaration, but this was done at the instance of the defendant, and he is not prejudiced thereby, and therefore cannot complain.

Did the court err in permitting the testimony of the witnesses Frey and Rymer, as set forth in the defendant's third bill of exceptions, to go to the jury to prove the pecuniary circumstances of the defendant; and in giving to the jury the instructions contained in his second bill of exceptions; and also, in refusing to set aside the verdict, arrest the judgment and award the defendant a new trial as set forth in his fourth bill of exceptions? The testimony of Frey and Rymer could only have been offered to enhance or aggravate the damages by showing that the "rank and influence of the of the defendant in society, and *therefore* the *extent of the injury*," are increased by his wealth. Under the circumstances surrounding the trial of this case; with full knowledge on the part of the defendant, that the daughter, at the time of the seduction, and even at the time of the trial, was under the age of twenty-one years, unmarried, and had resided in his family from the time she was seventeen years of age, until she returned to her father's house, and that her father, while she so resided there, was entitled to her attention and services; and that no proof whatever had been offered by the defendant tending to prove that the plaintiff had in fact abandoned or renounced his parental authority over her, except the fact that she made her own contract of service, and received her own earnings; the only material question left for the consideration of the jury was, what amount of damages the plaintiff was entitled to recover.

It has long been well settled, that in an action for seduction, and also in other actions for willful and wanton injuries done to the person and reputation, as for assault and battery, libel, slander, false imprisoment, malicious prosectuion and the like, the plaintiff is entitled to recover damages not only for expenses incurred by him, but for the loss of his time,

his bodily sufferings, and if the injury was willful, for his mental anguish also. *Sweeny* v. *Baker*, 13 W. Va. 158; 2 Greenl. Ev. sec. 267; and verdicts of juries awarding to the party injured, exemplary or punitive damages, have uniformly been sustained by the courts, except in cases where the damages were so enormous, as to satisfy the court that the vedict was the result of "prejudice, partiality, passion or corruption." Especially has this been done, and the verdicts upheld in actions for seductions, where the loss of the daughter's services, and the value thereof have always been regarded as innocent legal fictions, used to give the court jurisdiction, while the real measure of damages, was the shame, mortification, disgrace, dishonor and mental suffering inflicted upon the parent by the wrongful act of the seducer. *Fox* v. *Stevens*, 13 Min. 272; 2 Greenl. Ev. secs. 269, 579; *Sipe* v. *Eisenlerd*, 32 N. Y. 229; *Knight* v. *Wilcox*, 18 Bar. 212; *Larey* v. *Crooke*, 52 Wis. 612, reported in 38 Am. R. 768, and the numerous cases there cited. Upon this subject all the authorities agree; but whether the testimony showing the pecuniary circumstances of the defendant, ought to be given to the jury has been questioned by very respectable authorities, who have been disposed to limit the injury, to the amount the injured is entitled to receive, and not what the wrongdoer is able to pay. All the authorities however admit that the jury ought to consider not only the circumstances attending the commission of the wrong, but also the situation of the parties in life (*Andrews* v. *Askey*, 8 C. & P. 7; *Bennett* v. *Alcott*, 2 T. R. 167), and also the defendant's *rank and influence* in society, and therefore, the *extent of the injury*, as the same is increased by his wealth, and that testimony tending to show his pecuniary condition is pertinent to the issue. 2 Greenl. Ev. secs. 90 and 269; *White* v. *Murtland*, 71 Ill. 250.

The logical deductions from these principles as well as the weight of modern authorities warrant the conclusion that in an action for the seduction of a daughter the pecuniary circumstances of the plaintiff and defendant are proper subjects for the consideration of the jury in making up their verdict. 5 Wait's Actions and Defences 666, 668, and in *Lowry* v. *Crooke*, 52 Wis. 612, where Cassody, justice, delivering the opinion of the court says: "This was just the kind of evi-

dence that was held admissible in *Applegate* v. *Rubel*, 2 A. K. Marsh. 128, where a verdict of one thousand eight hundred dollars was sustained; and that courts are liberal in such a case to allow evidence to show the circumstances and conduct of the parties not only at the time of the alleged injury, but before and after it, as bearing on the question of damages." In *Hewitt* v. *Prime*, 21 Wend. 79, Chief Justice Nelson, delivering the opinion of the court, says: "The old idea of the loss of menial service which lay at the foundation of this action has given way to the more enlightened and refined views of the domestic relations. The services of the child are not alone regarded of value to the parent. The value of the society and attentions of a virtuous daughter is properly appreciated, and the loss sustained by the parent from the corruption of her mind, and the defilement of her body by the guilty seducer, is considered grounds for damages. 21 Wend. 732.

In *Clem* v. *Holmes*, 33 Gratt. 726, the court of appeals of Virginia established the doctrine, that "In an action by a father, for the seduction of his daughter, evidence offered by the father of the pecuniary condition of the defendant is competent."

Staples, judge, delivering the opinion in that case, says: "It is a matter of surprise, there ever could have been a question as to the admissibility of such evidence; the damages are not merely compensatory, they may be exemplary in their nature. In all such cases the wrong is aggravated in proportion to the wealth, position and rank of the guilty party, all of which may be the instruments by which he more readily accomplishes his purposes. A verdict absolutely ruinous to a man in moderate circumstances, would be scarcely felt by a man of large fortune, and would be but an invitation to a renewal of the offence, whenever the opportunity occurred for its commission."

We are therefore further of opinion that the circuit court did not err in permitting the evidence of the witnesses Rymer and Frey to be given to the jury, but the court erred in instructing the jury "that this action is based upon the right of the plaintiff to recover damages for the loss of services of the daughter occasioned by the wrongful act of the

defendant, and in order to maintain this action the plaintiff must show to your satisfaction by the evidence in this cause, that some loss of service was sustained by the plaintiff, however slight," but this instruction not being prejudicial to the defendant, he cannot complain of it. And we are of opinion that there *was no other error* in the instruction given to the jury as set forth the defendant's third bill of exceptions.

There remains only to be considered whether the circuit court upon the facts certified, erred in overruling the defendant's motion to set aside the verdict, arrest the judgment and award him a new trial because the verdict was contrary to the law and the evidence, and because the *damages were excessive.* That the verdict is not contrary to the *law* and the *evidence,* is abundantly shown by the *authorities cited,* and the *facts certified.* This Court in the case of *Sweeney* v. *Baker,* 13 W. Va. 158, held that a new trial will not be granted on the ground that the damages are excessive, especially in the Court of Appeals, unless the damages assessed by the jury are so enormous as to furnish evidence of "prejudice, partiality, passion or corruption," and this Court in that case refused to disturb the verdict which was for eight thousand dollars damages in a case of libel, where in the trial of that case, as also in the case at bar the defendant offered *no evidence whatever.* The rule above referred to, and settled in that case, must be regarded as the law of this State on that point. Was the verdict in the case at bar for three thousand dollars so enormous as to furnish sufficient evidence to satisfy the mind of this Court that the jury were influenced by prejudice, partiality, passion or corruption? The judge who presided at the trial, heard all the evidence, observed the conduct and demeanor of the witnesses, and therefore had better opportunity to judge of their credibility, than this Court can have, was satisfied with the verdict, and for that cause refused to set it aside. This fact alone, in a doubtful case would turn the scale in favor of the verdict. But in the case at bar, what substantial legal objection can be alleged against this verdict? It is true, it is a large verdict; larger than juries usually find in such cases. Who can say, with all the circumstances attending the trial and the facts proved in this case, and neither explained, contradicted or denied,

that it was the result of "prejudice, partiality, passion or corruption?" Was not the defendant simply mistaken, when he told the sorrowing father that if he sued him he would get nothing, and that *no jury of twelve men* could be found, some of whom were not in the same condition?

The alleged wrong was wanton, willful, deliberate; the daughter was young, was employed in the defendant's house; she was under his protection; her father who had known him for more than thirty years was a near neighbor; he believed the defendant to be a gentleman, and trusted his infant daughter to his care; he felt assured of her safety, for she slept in the chamber of his aged mother. That sanctuary might have been deemed a safe retreat. In this the unfortunate father was mistaken. The defendant had corrupted her; his toils were about her feet; she fell from her high estate, and society casts her out, and nothing is left but shame and unavailing grief. The facts in this record show that this illicit intercourse commenced about March 1, 1881, and "continued for a long time." When the plaintiff discovered his daughter's shame he was overwhelmed with grief, anger and mortification; he wrote to defendant, but received no answer; he went to see him; his propositions of compromise were rejected; the defendant admitted he was the father of her child; confident in his belief that the father was helpless, with a degree of heartlessness almost surpassing belief, he told the plaintiff that he had "violated no bastardy law; that if he sued him no jury of twelve men could be found, some of whom were not in the same condition; that if plaintiff did not want his daughter he could turn her out; she was a good walker and could find *some* place *to lie* in; she had money and could pay her board." What could be more cruel, more heartless; his daughter had fallen; his heart was wrung with anguish; his home was blighted; his other two daughters and his sons were abashed and disgraced by their sister's shame. Who can describe the father's anguish? His daughter is brought home with blighted hopes and broken heart, to be nursed and cared for by her father, "even if it cost him his last piece of bread."

The jury had the right to consider, and it doubtless did consider, all these circumstances of aggravation, in estimating

the damages to which they deemed the father entitled. Who will say that they placed too high an estimate on the value of the comfort, society, attentions and services of a pure and affectionate daughter? The jury did not think so; the learned judge who presided at the trial, did not think so; and this Court viewing the verdict in the light of all the surrounding circumstances, as disclosed by the record, cannot say, that this verdict is so enormous as to *furnish to our minds any evidence to induce us to believe that it was the result* of "prejudice, partiality, passion or corruption" on the part of the jury. We are therefore of opinion, that the circuit court of Ritchie county did not err in overruling the defendant's motion to set aside the verdict and the judgment, and award to him a new trial.

The judgment of said circuit court of Ritchie county rendered on the 30th day of July, 1882, is therefore affirmed with costs to the defendant in error, and damages according to law.

THE OTHER JUDGES CONCURRED.

JUDGMENT AFFIRMED.