# CHARLESTON.

## Mate Creek Coal Company *v.* Todd *et als.*

Submitted February 16, 1909.  Decided February 1, 1910.

1. Continuance—*Grounds—Absence of Witness.*
   This Court will not reverse the judgment of the trial court for refusing to grant a continuance to one of the parties on account of the absence of a material witness when it appears from the record that such witness is a non-resident of the state, and the party desiring his testimony could have taken his deposition before the trial.  (p. 672).

2. Trial—*Instruction—Repetition.*
   When certain instructions are given which correctly propound the law applicable to the state of facts developed by the evidence in the trial of a case, it is not error to refuse other instructions which state the same law in a different form.  (p. 674).

3. Same—*Instructions.*
   It is not error to refuse an instruction which does not rest upon some material fact which is either admitted, or supported by some appreciable evidence.  (p. 677).

Error to Circuit Court, Mingo County.

Action by the Mate Creek Coal Company against Fred C. Todd and others.  Judgment for plaintiff, and defendants bring error.

*Affirmed.*

*Stokes & Bronson,* for plaintiffs in error.

*Sheppard, Goodykoontz & Scherr,* for defendant in error.

Williams, Judge:

The Mate Creek Coal Company, a corporation, engaged in mining and selling coal, brought an action of *assumpsit* in the circuit court of Mingo county against Fred C. Todd, J. J. Sullivan and G. S. Calder, partners in the business of selling coal, commonly known as a selling agency, doing business in the firm name of "Damascus Coal Company"; and on the 18th of September, 1907, recovered a judgment against them for $1,030.23.  To this judgment defendants obtained a writ of error.

A number of errors are assigned. The first is that it was error to refuse a continuance of the case on account of the absence of J. J. Sullivan, one of the defendants, claimed to be a material witness and unable, on account of sickness, to attend upon the trial. The testimony of Fred C. Todd, another one of the defendants, was taken in support of the motion for a continuance, and is made a part of the record. His testimony proves that Sullivan lived in Cincinnati, Ohio; that he was suffering from nervous prostration and was under the care of a physician; that from the April previous to within a week before the trial, he had been in a hospital in Grand Rapids, Michigan; that on his return to Cincinnati, Ohio, he was able to walk from the depot to the street car; and that he was not, at the time of the trial, confined to his bed; that the case was continued at the previous term of court on account of the absence of this same witness. The affidavit of Thomas Bentham, one of defendants' attorneys, was also filed in support of the motion. It states that the condition of Sullivan had been such that his deposition could not have been taken, and that he was a material witness. The court may have concluded from the testimony of Todd that the motion was made to delay trial; or, it may have thought the evidence not sufficient to prove that Sullivan's deposition could not have been taken. One continuance had already been granted on account of Sullivan's sickness. The evidence in support of the motion does not show that his deposition could not have been taken in the mean time. The trial court is vested with a sound discretion in the matter of granting, and of refusing, continuances, and this Court will not reverse the rulings of the lower court upon such motion unless it is plainly erroneous. *Riddle* v. *McGinnis,* 22 W. Va. 253; *Hewitt's Case,* 17 Grat. 627; *State* v. *Betsall,* 11 W. Va. 703; *Marmet* v. *Archibald,* 37 W. Va. 778; *Bank* v. *Ralph-snyder,* 54 W. Va. 231.

The action was brought to recover money which plaintiff claimed to be due it on account of coal sold and delivered to defendants in pursuance of a special contract of sale. The principal defense is that the coal was not prepared at the mine according to agreement, and not as defendants had ordered it to be prepared; that when lump coal was ordered it would often contain too great a per centum of slack; that on account of this

fact defendants were compelled, in many instances, to allow a
rebate to their customers; and that, before they could dispose of
the coal to some other buyer, they would be charged demurrage
by the railroads. Defendants pleaded such rebates and de-
murrage as sets off to plaintiff's demand, and also pleaded pay-
ment. The contract was not reduced to writing, and the evi-
dence as to its exact terms is conflicting. S. T. Lambert, pres-
ident and general manager for plaintiff, testifies that it was
made on the 9th or 10th of November, 1905, between himself
and George W. Johnson, agent of the defendants; that defend-
ants agreed to sell the output of plaintiff's mine at a guaranteed
net price to it of at least ninety-five cents a ton, on the basis of
a run of mine, and as much more than the ninety-five cents per
ton as defendants would be able to get for the coal, less their
commission of ten *per centum,* which commission was, in no
event, to reduce the net price to plaintiff below ninety-five cents
per ton. He further testifies that two of the defendants, Sulli-
van and Todd, about a week or ten days after the contract was
made with their agent Johnson, came to the mine in Mingo
county, examined the character of the coal, the tipple and the
screen over which the coal was to be screened when other than
run of mine coal was to be ordered; that plaintiff was at that
time using a one inch screen; that Sullivan and Todd were sat-
isfied with the contract; that they agreed that it was to run for
a month at a time; or, as witness puts it, from month to month.
Lambert is corroborated by the testimony of George W. John-
son, agent of defendants, whose authority to make the contract
is admitted. The evidence further proves that for the output
of plaintiff's mine for the month of November defendants set-
tled and paid plaintiff a net price of more than one dollar per
ton, notwithstanding some of the sets off filed by them are on ac-
count of charges for rebates and demurrage on cars of coal
shipped in that month. Mr. Lambert testifies that the agree-
ment made with Johnson, agent, for the month of November
continued up until the 28th or 29th of December, at which time
he met Todd and Sullivan at Columbus, Ohio; that Todd then
said to him, all three being present together, "We will allow
you one dollar and two and one-half cents for November, that
as an average on the ton, and we will allow one dollars and five
cents for December, and we will go you even money for Janu-

ary"; that he meant by "even money" one dollar per ton. On the other hand, Todd testifies that, in accordance with the agreement made at Columbus on the 28th, or 29th, of December, they were to sell the coal for plaintiff on a commission of ten *per centum*, run of mine basis, and were to get the best prices obtainable, and that they did not guaranty any particular net price per ton to plaintiff. But the contract not being in writing, and its terms being a disputed fact, makes it a question for the jury to decide, from the conflicting testimony. They evidently found the contract to be according to plaintiff's contention and, there being sufficient evidence to support their finding, this Court will not invade their peculiar province by setting aside their verdict which rests upon conflicting oral testimony.

Defendants insists that it was error to give plaintiff's instruction No. 3, which tells the jury that if they believe from the evidence that defendants undertook to sell plaintiff's coal at the net price to plaintiff of ninety-five cents per ton for November shipments, one dollar and five cents for December shipments, and one dollar for January shipments, "then that the Jury must not allow any deduction from such net amounts on account of alleged expenses incurred by the defendants and rebates and demurrage." Rebates are defined by some of the witnesses to be allowances, or deductions from the price, made by the defendants to some of their customers who claimed that the coal that was shipped to them was not the kind they had ordered, and as the loss incurred in sometimes reselling coal that had been shipped, to other customers who refused to receive it for a like reason; and demurrage is defined to be the charges made by the railroads for failure to unload cars within a reasonable time after they reached their destination, the charge usually being about one dollar per day.

Defendants testified that much of the coal which they ordered to be shipped to their customers as lump was rejected by said customers because it contained too great a per cent of nut and slack, and that they had to resell the coal at a less price to other buyers, and that in some instances they were compelled to make a reduction in the original price to other of their customers for the same reason; also, that before they could make a resale of the coal they were necessarily delayed, and that they

had to pay demurrage to the railroad company for the use of cars. And they contend that these losses should be borne by plaintiff. There is no direct evidence in the case that plaintiff did not prepare every car of coal just as defendants had ordered it. It can not be inferred that it did not prepare it as directed by the orders sent in by defendants, simply because some of the coal ordered as lump was rejected by the customer because it contained a large *per centum* of slack and nut coal. Defendants knew, at the time they made the contract, that the lump coal was to be separated from the run of mine by means of a screen having one inch meshes; and coal so prepared would necessarily have a good deal of slack and nut coal in it. In view of this fact which defendants knew before making the contract, and in view of the testimony of Mr. Lambert, who says that it was distinctly agreed that there were to be no deductions on account of rebates and demurrage, and that plaintiff was to have one dollar and five cents for December, and one dollar for January shipments of coal, it was not error to give this instruction. It correctly sets forth the law applicable to plaintiff's theory of the case. Counsel for defendants insist that this instruction is in conflict with instruction No. 7 given for defendants, which is to the effect that, even though the jury should believe that the defendants had agreed that there were to be no charges against plaintiff for rebates and demurrage, yet, if they further believed that the coal shipped was not the kind and quality ordered by the defendants, and that by reason thereof the defendants necessarily incurred additional expense and loss on said coal, without fault on their part, that then the defendants would be entitled to a credit on the amount sued upon for such expenses and loss. This harmonizes with the plaintiff's No. 3. The credits which No. 7 would give defendants are not "rebates" and "demurrage", but defendants' actual loss and expenses, if any, which they incurred on account of plaintiff's own neglect to prepare the coal properly. No. 3 is not a binding instruction; it states the law applicable to one feature only of the case, and according to plaintiff's theory. It states the law of its theory correctly. We see that there is evidence to support this theory; the jury must have concluded that the evidence was enough to prove it, and they are the judges of the weight of evidence.

It is furthermore insisted that the court erred in refusing to give to the jury defendants' instructions Nos. 1, 3, 5 and 6. No. 1 would tell the jury that if they believe defendants were acting as agents, or factors, for plaintiff in selling the coal, and acted without fault or negligence on their part, and incurred losses on account of which plaintiff did not receive the prices for the coal as per the original orders; and that if they further believe defendants did not agree to reimburse plaintiff for any such losses, then plaintiff can not charge defendants with such loss.

No. 3 would tell the jury that in the absence of fault or negligence on the part of the agent, or factor, growing out of the business transacted by the agent, or factor, 'for his principal, the agent, or factor, is not liable for any loss incurred; nor would such agent, or factor, be liable for any loss resulting from the improper preparation of the coal whereby a resale was made necessary, and demurrage and other expenses incurred. No. 5 would tell the jury that if defendants were acting as agents, or factors, for plaintiff, and had accounted to their principal for more money than they had been able to sell the coal for by the use of proper diligence and care, that then they would be entitled to recover back the excess so paid to their principal. The principles embraced in Nos. 1, 3 and 5, refused, are fully covered by defendants' No. 7, before noticed, and by their No. 4, both of which were given. No. 4 is as follows: "The Court further instructs the jury that in the absence of a contract to the contrary, the principal is liable to the factor for all losses arising from the sale of the goods, the factor using due prudence both in making the sale and in attempting to collect the money, and if the Jury believe from the evidence in this case that the relation of principal and factor did exist between the plaintiff and defendants during the time of the dealings testified to herein, and that there were any losses in the sale of the plaintiff's coal, and that the defendants used due prudence both in making sale and in attempting to collect the money, and if the jury further believe that the defendants advanced to the plaintiff the price of said coal before learning of such losses, then the defendants are entitled to a credit on the sum sued upon in this action to the extent of all such losses." It was, therefore, not error to refuse to repeat this law to the jury in the form of the instructions rejected.

Defendants' No. 6, rejected, is as follows: "The Court instructs the jury that if they believe *fr* the evidence in this case that the plaintiff agreed with the defendants to ship lump coal to such persons as the defendants might designate and that in preparing such lump coal the same was to be run over a· one inch screen, and they further find that the defendants did order such lump coal to be shipped by the plaintiff and that such coal was so shipped as lump coal but afterwards refused by the parties to whom the same was shipped for the reason that it did not meet the standard of lump coal passing over a one inch screen, then before the plaintiff can recover for the coal the original price offered, it must appear from the evidence that such coal did pass over said one inch screen."

This instruction was not proper, because there is no evidence to prove that the defendants' customers to whom lump coal had been shipped had declined to receive it "for the reason that it did not meet the standard of lump coal passing over a one inch screen"; it is not even shown that any of said customers knew what was, or what should be, the standard of lump coal screened over such a screen, that is, what maximum per cent. of slack it should contain. The excuse given by them for rejecting the coal is that it did not come up to the standard of lump coal; that it contained too great a per cent. of nut and slack. Two or three of these customers say that there was as much as fifty or sixty per cent. of slack and nut in some of the coal which had been shipped to them as lump, but none of them state what portion of the nut and slack was slack, or what per cent. of the whole was slack. The only one of defendants' customers who was asked to define what he regarded as lump coal says, that he supposed lump coal was prepared by being screened over a four inch screen, that nut coal was screened over a two inch screen and that what is commonly called pea coal was screened over a three-quarter inch screen. So far as the evidence discloses, all the other customers may have had the same idea in regard to the kind of screen necessary to produce these three different grades of coal, and may have rejected the coal, because it did not measure up to the standard of lump coal screened over a four inch screen. Plaintiff did not contract with defendants to furnish any better grade of lump than could be prepared by running the coal over a one inch screen; its

tipple was not supplied with any other kind of screen, and the defendants knew this when they made the contract to take the output of the mine. If defendants' customers were disappointed in the grade of lump coal which was shipped to them from plaintiff's mine upon defendants' orders, plaintiff can not be held responsible for their refusal to accept it, unless plaintiff failed to prepare the coal which it billed as lump by screening it over a one inch screen. It was the duty of defendants to advise their customers of the kind of lump they would furnish to them from plaintiff's mine, and if they failed to do so it is no fault of plaintiff. It is true defendants offered to prove by witness G. S. Calder that they had, in fact, notified their customers to whom the November shipments were made that the lump was to be run over a one inch screen, and the court refused to let them prove it. But at the time this evidence was offered it appears that the depositions of witnesses, customers of defendants, had been read to the jury, and that the reasons assigned by said customers for rejecting the coal were as above stated. Consequently, those reasons being different from the one assumed in the instruction, the testimony offered for the purpose of proving that defendants had informed their vendees of the kind of lump coal that they were selling was immaterial. The reason shown by the proof for rejecting the coal is different from the reason embraced in the instruction which lacks the support of any evidence whatever. As a matter of course, coal screened over a one inch screen would contain a greater per cent. of nut and slack than coal screened over a larger screen; and, so far as the record discloses ,the lump coal which was rejected by any one of defendants' customers may have been rejected because it was not screened over a four inch screen, a thing they had no right to expect on account of anything said or done by plaintiff. No contractual relation existed between them and plaintiff whose only duty was to prepare the coal in the manner as it had agreed with defendants.

It is insisted that the court erred in refusing to permit witness Todd to answer the following question: "What was this man O'Rouke's financial ,condition at the time you sold this coal to him?" It appears that O'Rourke was a coal dealer himself, having his place of business in Chicago; that he failed in business and was adjudged a bankrupt; and defendants claim

a set-off of over four hundred dollars on account of coal sold to O'Rouke and not paid for by him. O'Rouke's deposition is in the case, and he testifies that he had ordered from defendants fifteen cars of "domestic lump coal" to be shipped to him from plaintiff's mine; that he received at least nine of these cars; that this coal was run of mine and not lump; and that his loss on these nine cars amounted to between three hundred and four hundred dollars; and that he did not account to defendants for this loss. It furthermore appears that the purpose in asking the question was to prove that O'Rouke was solvent at the time the sale of coal was made to him by the defendants. The question of his solvency is an immaterial matter, as defendants would be bound to plaintiff for the price of the coal, less their commission, and this is so whether they be regarded as straightout purchasers, or simply as agents, or factors, for plaintiff. If defendants were plaintiff's agents they were *del credere* agents. They do not deny their liability to plaintiff for the price, less their commission, for which they sold the coal. Their defense is that they did not guaranty any particular price per ton; that they sold it for the best price they could get on the market; and that their failure to get better prices than they got was due to plaintiff's failure to prepare the coal as they had ordered it to be prepared and shipped from the mine to their customers. The orders mailed to plaintiff were expressly stated to be "on accounty" of defendants. Defendants being liable to plaintiff as purchasers, the question of the solvency, or insolvency, of one of their customers could have no bearing on the case, and it was not error to refuse the question.

We find no error in the record and the judgment of the lower court will be affirmed.

*Affirmed.*