## SAMUEL BLAGGE *vs.* CYRUS H. ILSLEY.

*Suffolk.* April 4, 1877. — July 24, 1879. AMES & ENDICOTT, JJ., absent.

In an action by a father for the seduction of his minor daughter, there was evidence, including that of the daughter, that, before the seduction, the daughter appeared strong and well, and of gay and cheerful spirits, and that, after that time, she became nervous and excitable, and did not appear to be herself. There was no pregnancy or sexual disease, and no other evidence to show that the girl's condition of health was caused by the act of the defendant. *Held,* that the evidence would warrant the jury in finding that the girl's health failed as the immediate result of the defendant's act. LORD, J., dissenting.

If a father has not parted with the right to claim the services of his minor daughter, he may maintain an action for her seduction, although at the time thereof she is residing with another person.

If, in an action by a father for the seduction of his minor daughter, the defendant requests the judge to rule that the evidence does not show such loss of services arising from the seduction as will entitle the plaintiff to maintain the action, and the judge gives appropriate instructions relating to loss of service generally, it is not open to the defendant, on exceptions to the ruling and refusal to rule as requested, to contend that the instructions were misleading in not containing a qualification to which the attention of the judge was not directed.

TORT for seducing the plaintiff's minor daughter, "then and from thence hitherto the servant of the plaintiff, whereby she became sick and unable to render service to the plaintiff, so being her master as aforesaid, and thereby the plaintiff was deprived of the services of his said servant." Writ dated September 1, 1874. Answer a general denial. Trial in the Superior Court, before *Pitman,* J., who allowed a bill of exceptions, which, after stating that the pleadings might be referred to, was in substance as follows:

The girl was born July 13, 1855. In 1868 she went to live with one Blanchard and his wife, who was her sister, and thereafterwards, with the exception of her absence at school or on visits as hereafter stated, she continued to live in Blanchard's house as her home. There was no evidence of any intention on her part to return to live with her father, or on his part to provide a home for her or to claim her services.

The plaintiff kept house with his wife and daughters in Waltham in 1862. In May 1862, he broke up housekeeping, and went alone to North Carolina, where he engaged in business until 1872. In the latter year he removed to Boston, and since

then has resided there, boarding at different places; part of the time since this action was brought he has boarded at the house of Mr. Blanchard. After the plaintiff removed to North Carolina, his wife and her daughters boarded together until 1863, when the wife died. Thereafter the daughters lived in Roxbury with their aunt and grandmother until 1867. In that year the girl went to Pembroke, and remained a year on a visit with her relatives, and at the expiration of that time she came to Blanchard's house as above stated.

The plaintiff contributed towards the expenses of his family until 1868 or thereabouts, but since 1869 he has done nothing towards such expenses. He has never kept house in Massachusetts since his wife died in 1863. From 1868 to September 1871, the girl attended school at Jamaica Plain. During the vacation and at other times when at home, she assisted her sister in the care of the latter's children and of the house, and no further compensation was made to her or Mr. Blanchard for her board. Her grandmother furnished some money which was paid for her clothing and her personal expenses. In 1870 her grandmother was appointed her guardian. In 1874 her grandmother died, and Mr. Blanchard was appointed guardian, which appointment he held at the date of the writ. In 1871 the girl went to school at Norton, and remained there until June 14, 1873, with the exception of vacations, of which there were three each year, amounting in all to about two months each year. The expenses of this schooling were paid by her grandmother. The girl spent the vacations at Mr. Blanchard's house, there rendering the same service as before. In June 1873, Mrs. Blanchard was taken sick and was removed to a hospital at Providence, where she remained until the last of January 1874, when she returned home improved in health, but unable to do household work. Mr. Blanchard, in anticipation of his wife's removal to the hospital in June 1873, sent to the girl to return immediately from school. Upon receiving this message she at once left school and returned to Mr. Blanchard's house, arriving there June 14, the day subsequent to the removal of Mrs. Blanchard to the hospital.

On June 15, 1873, it was agreed between the girl and Mr. Blanchard that the former should assume the care of the house

and of Mr. Blanchard's children, and that she should be assisted by a nurse. An additional servant, who had been employed prior to that time, was discharged by Mr. Blanchard a few days afterwards. After June 15, the girl took care of the house, doing the necessary work, except the sweeping the parlors and chambers, assisted the nurse a little in cooking, and took the entire charge of the oldest child, a boy about five years old. The youngest child was cared for by the nurse. After Mrs. Blanchard's return, in January 1874, the girl continued to render the same services, but an additional servant was then obtained to help her.

After the plaintiff's return from the South in 1872, he frequently visited Mr. Blanchard's house, his habit being to go out there every Sunday morning and remain till Monday morning, and occasionally going Saturday night and remaining until Monday morning. But these visits were not so frequent during Mrs. Blanchard's absence at the hospital as above stated. He testified that he knew of the above arrangement between Mr. Blanchard and his daughter, and assented to it. At the time of the different visits of the plaintiff to Mr. Blanchard's house as above stated, when his daughter was at home she took care of his room, and occasionally, as he required it, or requested her to do so, she mended his clothes. She occasionally called upon him at his place of business also. But there was no other evidence of any services rendered by her to her father, nor was there any evidence that she was ever unable or had refused to perform any service which her father required or requested her to perform. In August 1873, the girl made a visit of about three weeks at Danvers, taking with her Mrs. Blanchard's oldest child, of whom she had the sole care during her visit. She went on this visit because, as she testified, she was run down because of her impaired condition of health. For the same reason she made a visit at Pembroke for four weeks in June 1874, and at Danvers again from July 1874 to January 1875.

The plaintiff put in testimony of himself and others, none of them physicians, to show that, prior to June 1873, the time of the seduction, his daughter appeared strong and well, and of gay and cheerful spirits ; and that after that time she became nervous and excitable, and that she did not appear to be herself. The

girl also testified to this effect. But there was no evidence, except the above, to show that this condition of health was produced by the acts of the defendant, or that it was not produced by some other cause. No pregnancy took place; nor was any sexual disease communicated by the defendant to the girl.

Upon this evidence, which was all the evidence in the case material to the questions presented, the defendant requested the judge to rule as follows: " Upon all the evidence in the case, there is no such loss of services shown arising from the seduction as will entitle the plaintiff to maintain this action."

The judge declined to give this ruling, and instructed the jury as follows: " If the evidence satisfies you that, as the immediate result of the criminal act, her health failed her, and there was a consequent loss of ability to render services, the plaintiff may recover; it is not necessary to show actual loss of services, but if the plaintiff retained and has not parted with his right to claim his daughter's services, or proved any act of service from her, however slight, the plaintiff may recover. Whether or not the plaintiff has parted with his right to claim his daughter's services, or abandoned her, is a question of fact for the jury to determine on the evidence. Merely permitting her to reside with Mr. Blanchard rendering services to him, under the circumstances, will not amount to an abandonment. In assessing damages the jury should not be confined to the mere pecuniary loss of services, but may give damages for the distress and anxiety of mind which the father has sustained in being deprived of the society and comfort of his daughter, and by the dishonor which he has received."

The jury returned a verdict for the plaintiff in the sum of $5000; and the defendant alleged exceptions to the above rulings and refusal to rule as requested.

*W. C. Loring*, for the defendant. 1. There was no evidence in support of the allegation in the declaration that the girl became sick and unable to render service to the plaintiff, her master. The case of *Hewitt* v. *Prime*, 21 Wend. 79, relied upon in the *dictum* of *Colt*, J., in *Blanchard* v. *Ilsley*, 120 Mass. 487, has been overruled in New York. *Bartley* v. *Richtmyer*, 4 Comst. 38, 43. *Knight* v. *Wilcox*, 4 Kern. 413. *White* v. *Nellis*, 31 N. Y. 405.

*Ingerson* v. *Miller*, 47 Barb. 47. It is also in direct conflict with several cases in England. *Eager* v. *Grimwood*, 1 Exch. 61. *Terry* v. *Hutchinson*, L. R. 3 Q. B. 599, 602. *Davies* v. *Williams*, 10 Q. B. 725. *Hall* v. *Hollander*, 4 B. & C. 660. *Thompson* v. *Ross*, 5 H. & N. 16. *Irwin* v. *Dearman*, 11 East, 23, 24. See also *Lee* v. *Hodges*, 13 Gratt. 726. As matter of principle, it is not law. In order to maintain an action for seduction, it is necessary to allege and prove (as *damnum*) that the plaintiff's property in the services of the party seduced has been impaired, and (as *injuria*) that the *damnum* was caused by the act of the defendant. *Grinnell* v. *Wells*, 7 M. & G. 1033. Bronson, J. in *Bartley* v. *Richtmyer*, *ubi supra*. The plaintiff can prove that he owned the services, either by showing that the party seduced actually rendered services, or by showing that the party seduced was bound to render services. In whichever of the two ways the plaintiff proves his property in the services, he must prove that that property, which he has proved he owns, has been impaired; he must prove a *damnum*. If the property is proved by showing the actual rendering of services, the *damnum* is proved by showing the failure to render those services. If the property is proved by showing a right to services, the *damnum* must be proved by showing an incapacity to render the services owned, whatever they may be.

2. To prove the allegation that he lost the services of his daughter, it was incumbent on the plaintiff to prove that her condition of health was such as to actually incapacitate her from performing as much menial service as her father could, considering her natural strength, reasonably demand from her. *Fores* v. *Wilson*, Peake, 55. *Taylor* v. *Neri*, 1 Esp. 386. *Burgess* v. *Carpenter*, 2 So. Car. 7. *Eager* v. *Grimwood*, *ubi supra*. In Massachusetts a man can be punished criminally for seducing a woman; Gen. Sts. *c.* 165, § 8; and there is therefore no reason why proof of the same loss of service should not be required in an action for loss of service caused by the seduction of a servant, as is required in an action for loss of service caused by any other battery of a servant. The evidence of loss of service in this case is very much weaker than that suggested in *Abrahams* v. *Kidney*, 104 Mass. 222; or that shown in *Vanhorn* v. *Freeman*, 1 Halst. 322, *Briggs* v. *Evans*, 5 Ired. 16, or *Manvell* v. *Thomson*, 2 C. & P.

303. If there was any evidence of the allegation that the girl "became sick and unable to render services" to the plaintiff, her master, there was no evidence on which the jury could find that the sickness and inability were caused by the act of the defendant. The evidence was merely that she made visits because her health was run down. The first visit was in August 1873, when the weather was very warm, and this after two months of meditation on her intercourse with the defendant, and after two months of housekeeping to which she was unaccustomed, during which she enjoyed good health, and it is argued that the running down of her health was caused by mental suffering on account of the act of the defendant. The plaintiff was careful not to ask the girl to testify why her health ran down, or whether she did suffer mentally, or why she so suffered. It may well have been from the exposure or abandonment, both of which are too remote.

3. If there was evidence on which the jury could find that the allegation *per quod servitium amisit* was true, the exception to the ruling given must be sustained, because the instructions given on this point were misleading. The jury were instructed that, if the girl was incapacitated from rendering any services, and not merely menial services, the *damnum* was proved. This was incorrect. The distinction should have been explicitly made clear to the jury, because most of the evidence on this point showed that she was incapacitated from serving her father by making his life agreeable and pleasant, but did not show that she was incapacitated from doing the menial labor which he was accustomed to, or might have required of her.

*R. M. Morse, Jr.*, for the plaintiff.

COLT, J.   At the trial, the defendant requested the court to rule that the evidence failed to show such loss of service, resulting from the alleged seduction, as would entitle the plaintiff to maintain this action.

The plaintiff must prove, first, that he was entitled to the service of his daughter at the time of the injury, and, next, that the ability of his daughter to render service was impaired by the defendant's unlawful act.

There was evidence from several witnesses, including the plaintiff and the daughter, that the latter appeared strong and

well before the alleged seduction, and that afterwards she became nervous and excitable, and did not appear to be herself. Upon this part of the case, the jury were told that the plaintiff might recover, if they were satisfied that, as the immediate result of the criminal act, the health of the daughter failed, and there was a consequent loss of ability to render service ; and it must have been found by the jury that the proximate effect of the seduction was an incapacity to work.

In the opinion of a majority of the court, it cannot be declared, as matter of law, that this instruction was erroneous, or that the evidence did not justify the finding. The decline in the daughter's health and spirits directly followed the wrong charged. The daughter was herself a witness, and there was opportunity for the jury to judge of her physical strength and temperament, her natural delicacy and sensibility to the injury alleged. It cannot be laid down, as matter of law, that loss of health would not be the natural, probable and direct consequence of the defendant's act, although that act was followed by no sexual disease and no pregnancy. Shame, humiliation and mental distress, affecting the sensibilities of the victim and her capacity for faithful service, may well be a probable and natural consequence of the wrong, wholly without regard to the fear of abandonment or exposure.

The case is thus brought within the rule laid down in *Abrahams* v. *Kidney*, 104 Mass. 222, where it was held by this court that it was sufficient to support the action, if the proximate effect of the criminal connection is an incapacity to perform service ; as where the wrong committed, without producing pregnancy, or sexual disease, causes bodily injury, or mental distress or disease, impairing health. It was declared that the same principle, which gives the master an action when the connection causes pregnancy or sexual disease, applies when the consequence of the act is loss of health resulting in loss of service. To this extent, the law affords a remedy for the wrong done by the seducer. Loss of service is the technical foundation of the action, and there is no sound distinction between loss of service, as the result of physical disability produced by physical causes alone, and loss of service, the result of mental suffering and disturbance. In fact such is the mutual dependence of the mental and physical organization,

such the direct and mysterious sympathy which exists when the healthy condition of either is disturbed, that it seems impracticable to attempt to distinguish between them. The damage to the parent and master in both cases is, at all events, the same.

In the administration of this remedy, courts have been governed by a liberal spirit, and damages not limited to loss of service have always been allowed to cover the real gravamen of the case, namely, the wounded feelings, the mortification and disgrace brought upon the plaintiff and his family by the act. The fiction of service is upheld, but it is applied by the courts so as to afford a substantial and useful remedy for a wrong done. It would defeat the real purpose of the remedy to require in all cases proof of pregnancy or sexual disease. It is the duty of the defendant not to cause the servant to deprive the master of the service due; and that duty is equally violated whether the result is effected by improper artifice or by physical injury. The remedy, on principle, is equally clear whether the injury is produced by beating and wounding, by enticing away, or by seduction. In each case, the defendant's wrongful act has caused a direct injury to the plaintiff's lawful right; an injury which might fairly have been contemplated by the defendant.

In addition to the cases cited in *Abrahams* v. *Kidney*, we refer to *Boyle* v. *Brandon*, 13 M. & W. 738, and *Manvell* v. *Thomson*, 2 C. & P. 303. In the former case, there was no pregnancy and no disease, the illness of the daughter was caused by distress of mind produced by the defendant's abandonment, and for that reason was treated as too remote by Pollock, C. B.; but it is to be inferred from the remarks of the judges at the argument, that, if the distress of mind had been the direct result of the seduction, it would have been thought sufficient to support the action. The case went off on another point. In the latter case, it was distinctly ruled by Abbott, C. J., that proof that the niece of the plaintiff, after her seduction and abandonment, was in a state of great agitation, received medical attendance, and was obliged to be watched lest she should do herself some harm, was sufficient to raise the presumption of that loss of service which was necessary to maintain the action. See also *White* v. *Nel-*

*lis,* 31 N. Y. 405; *Briggs* v. *Evans,* 5 Ired. 1t, 20; Cooley on Torts, 231.

As to the proof required to establish the relation of master and servant, the instruction given was that the plaintiff might recover if he had not parted with his right to claim his daughter's service, or proved any act of service however slight; that whether or not the plaintiff had parted with his right to claim her services, or had abandoned her, was a question of fact on all the evidence; that merely permitting her to reside with another person, rendering services to him, would not amount to an abandonment. The judge also said, in this connection, that it was not necessary to show actual loss of service. But this could not have been understood as implying that it was not necessary to prove that the ability to render service, when required, was directly impaired by the defendant's act. The jury had just been told the contrary, in plain and distinct terms. They must have understood by the remark, that proof of acts of service was not necessary, if the right of the plaintiff to his daughter's service was established. When he has not parted with that right, it is sufficient to prove that she resides with him and is under age, or that, if she resides and is employed elsewhere, he has not lost his right to her service. The technical foundation of the action, namely, the loss of ability to render service to the prejudice of the plaintiff's rights, is, to this extent, still maintained in the courts of this country, as in England. *Blanchard* v. *Ilsley,* 120 Mass. 487. *Kennedy* v. *Shea,* 110 Mass. 147. *Abrahams* v. *Kidney,* above cited. *Bartley* v. *Richtmyer,* 4 Comst. 39, 47. *Hornketh* v. *Barr,* 8 S. & R. 36. *Terry* v. *Hutchinson,* L. R. 3 Q. B. 599. *Blaymire* v. *Haley,* 6 M. & W. 55.

The language which the defendant here subjects to criticism must have been used in the sense above indicated, in *Hewitt* v. *Prime,* 21 Wend. 79. There the daughter, who was under age, was made pregnant before suit brought, while living at home. The judge refused to rule at the trial that the plaintiff must prove loss, expense or damage, before suit brought, and Nelson, C. J., declared that acts of service by the daughter were not necessary; it was enough to support the action when the relation of service exists. The authority of that case does not appear to have been questioned in the New York courts. It

is the act of seduction which gives the right of action to the parent and master, when that act is followed by pregnancy, sexual disease or loss of health. See *Davies* v. *Williams*, 10 Q. B. 725.

The defendant now further insists that the instructions given were calculated to mislead the jury, because they were not told that it was incumbent on the plaintiff to prove that the condition of the daughter's health was such as to actually incapacitate her from performing such menial labor as the plaintiff could reasonably demand. But, without deciding whether any such qualification of the rule in reference to menial labor exists, it is sufficient to say that no such qualification was suggested or asked for at the trial; on the contrary, the defendant's request on this subject had reference only to loss of service generally. He cannot now complain that, in answer to those requests, the judge did not take the distinction now suggested.

For these reasons, a majority of the court is of opinion that the defendant has no ground of exception.

LORD, J. I do not concur in the opinion of my brethren. When the case was under consideration, I laid before them fully all my reasons of dissent. These reasons failed to satisfy them, and it does not seem to me necessary or expedient to encumber the reports by repeating them in full. I content myself with saying, that, after as full and careful an examination as I can make, and with the assistance of the researches of the learned counsel for the plaintiff, and, more than all, of the learning of my associates, I have not discovered an action of this nature which has been sustained by a court of last resort. It is not contended that, by the defendant's act, there was either immediate physical injury done, or disease communicated, or the impregnation of the plaintiff's servant. The claim of the plaintiff is, that his servant's mental distress, occasioned by seduction by the defendant, is the cause of his loss. If this be so, the act of the defendant was the remote and not the proximate cause of the inability of the servant to labor, and I do not deem it necessary to discuss the question when the cause of action arises, whether at the time the act is committed by the defendant, or at the time when the attention of the victim is called to the enormity of her own misconduct, the remembrance of which deprives her

of her capacity to work. If some subsequent personal reflection, some discourse from the pulpit or in the family, or perchance some public rumor, or even internal conviction of wrong, shall bring the subject to a condition of mind in which her capacity to labor is diminished, I do not deem it necessary to inquire whether the act of the defendant, which may well enough be deemed to be the *causa causans*, is itself the cause of action, or whether the condition of mind of the victim is the cause of the physical inability to perform service.

The action itself is anomalous. At first, the remedy of the father whose daughter was seduced was by an action of trespass *quare clausum fregit*, and a right of action having been established by the entry of the defendant into the plaintiff's close, the seduction of the plaintiff's daughter was admissible in evidence to enhance the damages of the trespass *quare clausum*. At subsequent periods, different modes of declaring, both in trespass and in case, were resorted to and were sustained by the courts. If anomalies be also allowed in the prosecution of the action, probably no serious harm will follow. There might be some difficulties, if a woman should repent after a promiscuous sinning, and her repentance should disqualify her for labor, or perhaps consign her to an insane asylum, in determining the relative responsibility of those with whom she had engaged in passionate indulgence; but the court happily can relieve itself from all difficulty by requiring that the relative proportion of the injury under the different circumstances shall be determined by the jury. *Exceptions overruled.*