FRED REUTKEMEIER, Appellee, v. BEN NOLTE, Appellant.

WITNESSES: Privileged Communications—Confession of Sin. A communication to the elders of a church as to the truth attending illicit sexual relations between the communicant and others is privileged, such elders being "ministers" of the gospel, under the particular doctrine and confession of faith of said church.

**SEDUCTION:** Civil Liability—Evidence—Declaration of Minor. In an action by a parent for damages by reason of the seduction of his minor child, declarations of the minor to third persons as to the cause of her condition are not admissible as *substantive* testimony against the parent.

**WITNESSES:** Privileged Communications—Impeachment. A privileged communication is not available for impeachment purposes.

**WITNESSES:** Privileged Communications—Who is A "Minister." Whether a certain officer of a church organization is a "minister," within the law of privileged communications, must be determined by the ecclesiastical doctrines and laws of the particular denomination.

**SEDUCTION:** Civil Liability—Exemplary Damages. Exemplary, in addition to actual, damages may be recovered by a parent for the seduction of his minor child.

**DAMAGES:** Exemplary Damages—Seduction—Double Recovery. It is no defense to a claim by a parent for exemplary damages for the seduction of his minor child, that the wrongdoer may also be liable to a claim for like damages in an action by the injured female.

**TRIAL:** Verdict—Excessiveness—$500 Actual, $6,000 Exemplary. Verdict of $500 actual, and $6,000 exemplary, damages for seduction of minor, under circumstances showing great wantonness and depravity, sustained.

**EVIDENCE:** Opinion Evidence—Value. If items of services are such that a jury would probably be familiar therewith, proof of *payment* may be sufficient to carry the question of reasonableness to the jury.

**EVIDENCE:** Opinion Evidence—Value—Hearsay. Necessarily, a knowledge of values is largely acquired from sources other than the personal experience of the witness. So held as to testimony touching the value of wages of a domestic.

**SEDUCTION:** Civil Liability—Loss of Services of Minor. A parent may recover for loss of the services of his minor child consequent on seduction, without showing that he had work for the minor to do.

**SEDUCTION:** Civil Liability—Consent of Female to Debauchment—Effect. That the minor consented to her debauchment is no defense to an action by the parent for damages by reason of the debauchment.

*Appeal from Winneshiek District Court.—A. N. HOBSON,*
Judge.

WEDNESDAY, FEBRUARY 14, 1917.

ACTION for damages, actual and exemplary, by the
plaintiff against the defendant for the alleged debauch-
ing of his minor daughter. Actual damages for expenses
and loss of service are claimed under the provisions of Code
Section 3471. The defense was a general denial. There was
a verdict for the plaintiff for $6,500, and the defendant
appeals.—*Affirmed.*

*Frank Sayre* and *E. W. Cutting,* for appellant.

*William S. Hart* and *Boice & Hook,* for appellee.

EVANS, J.—The facts, as contended by plaintiff, briefly
stated, are that, in September, 1912, the defendant, a man
then 21 years of age, had carnal knowledge of the plaintiff's
daughter, Mary, then a child only 14 years of age. In June,
1913, she gave birth to a child, alleged to be the result of
such intercourse. The plaintiff was, at the time, a farmer,
living upon his own farm. He was a widower, with three
daughters and three sons, all living with him at his home.
The evidence on behalf of the plaintiff was quite abundant
to sustain the verdict. The appeal is presented here on
assignments of error assailing certain rulings in the ad-
mission of testimony and certain instructions of the court.

I. The most important and doubtful

1. WITNESSES: privileged com-munications: confession of sin.

question raised relates to an alleged privi-
leged communication, the claim of privilege
being based on Code Section 4608. Plain-
tiff's daughter was a member of the Presbyterian church.
In the month of March before her child was born, she was
asked to appear and did appear before the church session.
Such session consisted of the pastor and the three ruling
elders. She appears to have confessed her sin, and to have

made certain communication to the elders. On the trial of this case, the defendant sought to show what such communication was. It is claimed for the defendant that such communication involved others, as well as himself, and that at least it cast much uncertainty upon the paternity of the

2. SEDUCTION: civil liability: evidence: declaration of minor.

child. The plaintiff objected to such line of testimony, both on the ground that it was not binding upon him as substantive testimony, and that, in any event, it was a privileged communication under the provision of the statute. The first objection was clearly good as far as it went. The

3. WITNESSES: privileged communications: impeachment.

defendant, however, sought to lay a foundation in the cross-examination of the daughter Mary as a witness for her impeachment, by calling her attention to such alleged communication. Of course, if the communication was not privileged, it was competent, even as against the plaintiff, to offer the same for the purpose of impeachment. On the other hand, if the communication was privileged, it was no more available to the defendant for impeachment purposes than for any other purpose. If it was privileged, then, under the view of the trial court, it would be equally improper to lay a pretended foundation for its introduction as impeaching testimony. The question, therefore, was precipitated in the cross-examination of the witness Mary. The trial court exercised its discretion to stop temporarily the cross-examination, and to permit the parties, in the absence of the jury, to introduce evidence of such facts as were material to be considered, to enable the court to determine whether the communication in question was privileged. It is not free from doubt, upon the record before us, whether the cross-examination of the witness at this point was justified by the state of her testimony at the time. In view of the fact, however, that the attention of both court and counsel appears to have been concentrated upon the question of privilege,

as decisive of that line of examination, we are disposed to meet that question as the one of larger merit. Code Section 4608 is as follows:

"No practicing attorney, counselor, physician, surgeon, or the stenographer or confidential clerk of any person, who obtains such information by reason of his employment, minister of the gospel or priest of any denomination shall be allowed, in giving testimony, to disclose any confidential communication properly intrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline. Such prohibition shall not apply to cases where the party in whose favor the same is made waives the rights conferred."

4. WITNESSES: privileged communications: who is a "minister."

In applying this section to the case before us, two questions naturally arise:

1. Was the communication a confidential one?

2. Were the recipients of such communication ministers of the Gospel, within the meaning of the statute?

As to the first question, it is apparent that the communication was of such a nature as would usually and naturally be deemed confidential, if for no other reason than that it involved a confession of sin to a spiritual adviser. We feel no hesitancy in holding the affirmative on this question. The second question presents greater difficulty. What is a "minister of the Gospel," within the meaning of this statute? The law as such sets up no standard or criterion. That question is left wholly to the recognition of the "denomination." The word "minister," which, in its original sense, meant a mere servant, has grown in many directions, and into much dignity. Few English words have a more varied meaning. In the religious world, it is often, if not generally, used as referring to a pastor of the church and a preacher of the Gospel. This meaning, however, is

not applicable to all Christian denominations. Some of them have no pastors and recognize no one as a minister in that sense, and yet all denominations recognize the spiritual authority of the church, and provide a source of spiritual advice and discipline. The record herein contains a copy of the "Confession of Faith" of the Presbyterian church, as well as other standard booklets setting forth the doctrine and polity of that denomination. The following excerpts therefrom will sufficiently indicate the same:

"That our blessed Saviour, for the edification of the visible church, which is his body, has appointed officers, not only to preach the gospel and administer the Sacraments, *but also to exercise discipline,* for the preservation both of truth and duty; and that it is incumbent upon these officers, and upon the whole church, in whose name they act, to censure or cast out the erroneous and scandalous, observing, in all cases, the rules contained in the Word of God.

"The ordinary and perpetual officers in the church are Bishops or Pastors; the representatives of the people, usually styled Ruling Elders; and Deacons.

"The pastoral office is the first in the church, both for dignity and usefulness. The person who fills this office hath, in Scripture, obtained different names expressive of his various duties************ As it is his duty to be grave and prudent, and an example of the flock, and to govern well in the house and kingdom of Christ, *he is termed presbyter or elder.*

"Ruling elders are properly the representatives of the people, chosen by them for the purpose of exercising government and discipline, in conjunction with pastors or ministers. This office has been understood, by a great part of the Protestant Reformed churches, to be designated in the Holy Scriptures by the title of governments; and of those who rule well, *but do not labor in the word and doctrine.*

"1. The church session consists of the pastor or pastors and ruling elders, of a particular congregation.

"2. Of this judicatory, two elders, if there be as many in the congregation, with the pastor, shall be necessary to constitute a quorum.

"3. The pastor of the congregation shall always be the moderator of the session, except when, for prudential reasons, it may appear advisable that some other minister should be invited to preside, in which case the pastor may, with the concurrence of the session, invite such other minister as they may see fit, belonging to the same presbytery, to preside in that case. The same expedient may be adopted in case of the sickness or absence of the pastor.

"4. It is expedient, at every meeting of the session, more especially when constituted for judicial business, that there be a presiding minister. When, therefore, a church is without a pastor, the moderator of the session shall be either the minister appointed for that purpose by the presbytery, or one invited by the session to preside on a particular occasion. *But where it is impracticable, without great inconvenience, to procure the attendance of such a moderator, the session may proceed without it.* ***

"6. *The church session is charged with maintaining the spiritual government of the congregation;* for which purpose they have power to inquire into the knowledge and Christian conduct of the members of the church; to call before them offenders and witnesses, being members of their own congregation, and to introduce other witnesses where it may be necessary to bring the process to issue, and when they can be procured to attend; to receive members into the church; to admonish, to rebuke, to suspend or exclude from the Sacraments, those who are found to deserve censure; to concert the best measures for promoting the spiritual interests of the congregation, to supervise the Sabbath school and the various societies or agencies of the congre-

gation; and to appoint delegates to the higher judicatories of the church.

"*To these officers* the keys of the kingdom of Heaven are committed, by virtue thereof they have power respectively to retain and remit sins, to shut that kingdom against the impenitent, both by the word and censures, and to open it unto penitent sinners, *by the ministry of the gospel,* and by absolution from censures, as occasion shall require."

To the foregoing, it may be added that the office of ruling elder is perpetual, and no person can be divested of it except by removal. These ruling elders have nothing to do with the temporal affairs of the church, but deal wholly with its spiritual side and its discipline. It will be noted also, from what we have quoted, that, although it is required that the pastor of the congregation shall always be the moderator of the session, when there is a pastor, yet, if there be no pastor, and it be impracticable to obtain another pastor, the ruling elders are authorized to conduct the session without one. It will be noted also that there is no power of discipline conferred upon the pastor except in conjunction with the ruling elders. The pastor of the church is not denominated as a "minister," but as an elder or presbyter. The power of discipline conferred upon the pastor is conferred upon him only in a joint sense, as one of the "officers." "These officers" are recognized as having power "to shut that kingdom against the impenitent, both by the word and censures, and to open it unto penitent sinners by the 'ministry of the Gospel' and by absolution from censures as occasion shall require."

Turning now to the statute itself, the fact that it lays its inhibition upon stenographers and confidential clerks "of any person who obtains such information by reason of his employment," indicates a rather broad scope to the statute, and indicates the legislative intent that the privileged communication should be protected also against divul-

gence by other persons, whose duty and relation to the chief recipient were such as to enable them to know the communication. It is urged for the appellant that the provision referring to stenographer or confidential clerk does not apply to the minister and priest. That question is not very material for our present purpose. We think, however, that, by its express terms, the inhibition does apply to the stenographer or confidential clerk "of any person who obtains," etc. It will be noted further that the statute defines the privileged communication as one necessary and proper to enable the person receiving it to discharge the functions of his office according to the "usual course of practice or *discipline.*" It is manifest that the word "discipline" has special reference to a "minister of the gospel" or "priest." It has no special applicability to the office of attorney or physician. The only course of discipline known to the Presbyterian denomination is that exercised by the ruling elders, sitting jointly with the pastor as a moderator. The denomination itself, by its confession of faith, characterizes the work of these elders as a "ministry of the gospel." The purpose of the statute is one of large public policy. We are told of one in an olden time who "found no place of repentance, though he sought it carefully with tears." This statute is based in part upon the idea that the human being does sometimes have need of a place of penitence and confession and spiritual discipline. When any person enters that secret chamber, this statute closes the door upon him, and civil authority turns away its ear. The privilege of the statute purports to be applicable to every Christian denomination, of whatever polity. Under the polity of the Presbyterian denomination, this privilege cannot be applicable to it unless it be true that the ruling elders are "ministers of the Gospel," within the meaning of the statute. We find they are such within the contemplation of the Presbyterian Confession of Faith, and there-

fore they are such within the meaning of the statute. We hold that the trial court ruled correctly at this point.

5. SEDUCTION: civil liability: exemplary damages.
II. This action on behalf of the father rests upon Code Section 3471, which gives him a cause of action for "expenses and loss of service" resulting from the alleged wrong perpetrated by the defendant. By their verdict the jury allowed actual damages in the amount of $500, and $6,000 as exemplary damages. It is earnestly urged by the appellant that there is no warrant under the law for the awarding of exemplary damages in such a case. Special stress is laid upon the terms of Section 3471, under which plaintiff's cause of action arises. It is said that, by the very terms of this statute, his recovery is limited to expenses and loss of service. The argument cannot be sustained. Exemplary damages are a mere incident of actual damages, and do not, in a strict sense, form any part of the cause of action. They are punitive in their nature, and are allowed also by way of example for their restraining effect upon others, and are only allowed when the wrong alleged involves wickedness or malice. The facts of this case, as disclosed by the testimony on behalf of plaintiff, and as found by the jury, disclose a case of great wantonness and depravity, both as against the female and as against the father. So far as we know, the authorities are practically uniform in sustaining exemplary damages in such a case. The appellant cites no authority to the contrary.

6. DAMAGES: exemplary damages: seduction: double recovery.
It is especially urged that the father at least is not entitled to exemplary damages, but the daughter only. Otherwise, it is argued that defendant may be subjected to double punishment, by a possible allowance hereafter of exemplary damages to the injured female. This is a situation that has often been met. The fact that a defendant has been or may be held liable for exemplary damages in one case has never

been held as a defense in his favor against liability for exemplary damages in another case to another plaintiff. The fact that he has paid exemplary damages will not protect him against punishment in a criminal proceeding; nor will the fact that he has been punished in a criminal proceeding exempt him from exemplary damages in a civil proceeding. In other words, the law of "once in jeopardy" has no application to exemplary damages in a civil suit. The following are a few of the many authorities which sustain the lower court on this question: *Hauser v. Griffith,* 102 Iowa 215; *Ward v. Ward,* 41 Iowa 686; *Luther v. Shaw,* 157 Wis. 234; *Riddle v. McGinnis,* 22 W. Va. 253; *Ingerson v. Miller,* 47 Barb. (N. Y.) 47; *Hein v. Holdridge,* 78 Minn. 468; *Morgan v. Ross,* 74 Mo. 318; *Kerns v. Hagenbuchle,* 17 N. Y. S. 369; *Stowers v. Singer,* 113 Ky. 584; *Ingersoll v. Jones,* 5 Barb. (N. Y.) 661; *Lavery v. Crooke,* 52 Wis. 612; *Klingman v. Holmes,* 54 Mo. 304.

7. TRIAL: verdict: excessiveness: $500 actual, $6,000 exemplary.

It is further urged that the amount of the exemplary damages is excessive. It is large. Upon the record before us, we do not feel justified in interfering, finding as we do that exemplary damages were clearly allowable in the case. The amount thereof was peculiarly within the province of the jury. See the following cases: *Saunders v. Mullen,* 66 Iowa 728; *International Harvester Co. v. Iowa Hardware Co.,* 146 Iowa 172; *Welsh v. Haleen,* 157 Iowa 647; *Morgan v. Muench,* —Iowa— (November 17, 1917).

8. EVIDENCE: opinion evidence: value.

III. It is also urged that there was no evidence to sustain a finding of actual damage; and further, if there be such evidence, that the amount allowed was excessive.

In proof of the expense incurred, it was shown that the doctor's bill of $25 was paid for the obstetrical services. No evidence was introduced to the effect that the amount so paid was reasonable. It is urged, therefore, that

there was no evidence of expense. Particular reliance is had by the appellant upon the case of *Carnego v. Crescent Coal Co.,* 164 Iowa 552. It was held in that case that mere evidence of the payment of a lump sum of $529 for funeral expenses was not a sufficient showing that such amount was a reasonable expense. It was said in that case that, if the items and the cost of them had been disclosed, they might have furnished a sufficient basis for the jury to pass upon the reasonableness of the expense. It was also said therein, in recognition of our previous holdings, that, where the nature of the items of service is such that a jury would be likely to be familiar therewith, proof of payment is enough to carry the question of reasonableness to the jury. See *Lampman v. Bruning,* 120 Iowa 167; *Scurlock v. City of Boone,* 142 Iowa 684.

In the case at bar, it was made to appear that the doctor had been called out to the country home twice, and that one or more visits had been made to his office, previous to such time. There is nothing startling in the amount of the bill for the services thus rendered. Most people have some idea of the ordinary charges of a doctor to his patients. If an expert had testified to their value in this case, the jury would not have been bound by his testimony, under our repeated holdings. The services rendered were substantial and important, and there is nothing in the amount of the bill that tends to excite distrust of its reasonableness; and we think the case at this point comes well within our previous cases cited above.

9. EVIDENCE: opinion evidence: value: hearsay. In proof of the value of services lost, an elder daughter of the plaintiff's testified to the ordinary wages of household help at from $4.00 to $4.50 a week. It was made to appear, from her cross-examination, that she never had paid any such wages and had never received any, and that what she knew was her general information, obtained through others. It

is urged that this evidence was mere hearsay and amounted to nothing, and that, therefore, there was no proof of the value of services. It did appear from the testimony of the witness that her eldest sister worked out most of the time, and that she knew what such sister got. But it is urged by the appellant that this was also hearsay, as having been obtained from the sister. It is needless to dwell at length upon this objection. There is an element of hearsay that enters into all general knowledge, and that is especially so as to knowledge of values and markets and going wages. The evidence is not for that reason objectionable. This was a subject also upon which the jury might well be deemed to have some knowledge. Few people are wholly lacking in knowledge thereon, and many people would deem the testimony of the witness as very conservative. In view of the nature of the subject thus testified to, we think the evidence was quite sufficient to go to the jury. Four years of her minority remained to the plaintiff's daughter, and surely this furnished a sufficient basis for the amount of actual damages.

10. SEDUCTION: civil liability: loss of services of minor.          It is said, however, that the plaintiff had no work for his daughter to do, and therefore he could lose nothing by the loss of her services. It is argued that it was incumbent upon him to prove that he had work for her to do before he can lay a claim for loss of services. It might well be retorted that her disability of itself would have been a sufficient reason for not procuring work for her to do, and a sufficient reason for not putting himself in a position of dependence upon her labor. This, however, is not the criterion. The plaintiff was *entitled* to her services. This was, at least *prima facie,* sufficient to enable him to recover for their value. There was no burden upon him to prove that he would have used her services if she had not been disabled. She was a member of his family and in his custody and con-

trol.  He was responsible for her support and entitled to her services.  See the following authorities:  *Riddle v. McGinnis,* 22 W. Va. 253; *Greenwood v. Greenwood,* 28 Md. 369; *Kennedy v. Shea,* 110 Mass. 147; *Bolton v. Miller,* 6 Ind. 262; *Martin v. Payne,* 9 Johnson (N. Y.) 387; *Hewitt v. Prime,* 21 Wend. (N. Y.) 79; *Middleton v. Nichols,* 62 N. J. L. 636; *Blagge v. Ilsley,* 127 Mass. 191; *Russell v. Chambers,* 31 Minn. 54; *Roberts v. Connelly,* 14 Ala. 235; *Ball v. Bruce,* 21 Ill. 161.

11. SEDUCTION: civil liability: consent of female to debauchment: effect. The defendant requested an instruction to the effect that, if the female consented to her debauchment, the plaintiff could not recover.  This proposition is urged strenuously in argument.  No authority in point is cited in support of it.  The law takes no account of the alleged consent of a female child under the age of consent. Consent or want of consent is not an element of plaintiff's case; how then can it become a defense?  It is argued as though it were an affirmative defense; but no affirmative defense was even pleaded.  To our minds, the point is without merit.

The foregoing comprises the principal assignments of error.  Some other minor matters are suggested in the course of the argument, but we find no error in the record.  The judgment below will therefore be—*Affirmed.*

LADD, WEAVER and PRESTON, JJ., concur.